767 F.2d 161
 54 USLW 2132
 Sharon GRANDSTAFF, Individually and As Representative of the
Estate of James C. Grandstaff; and Kay Lajune Grandstaff,
As Next Friend of Jo Cheryl Grandstaff, A Minor, et al.,
Plaintiffs-Appellees, Cross-Appellants,
v.
The CITY OF BORGER, TEXAS, et al., Defendants-Appellants,
Cross-Appellees.
Sharon GRANDSTAFF, Individually and As Representative of the
Estate of James C. Grandstaff, et al., Plaintiffs-Appellees,
v.
The CITY OF BORGER, TEXAS, et al., Defendants-Appellants.
 Nos. 84-1241, 84-1337.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 5, 1985.
 
 Gibson, Ochsner & Adkins, Wayne P. Sturdivant, Amarillo, Tex., Gassaway, Gurley, Sheets & Mitchell, Jody Sheets, Borger, Tex., for City of Borger, Tex., et al.
 Haynes & Fullenweider, Clinard J. Hanby, Robert B. Wallis, Houston, Tex., for Grandstaff, et al.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The City of Borger police mistook James C. Grandstaff for a fugitive and killed him. The estate and family of Grandstaff sued and recovered $1,430,000, together with attorneys fees and expenses, from four of the officers as well as the City. We uphold the liability of the officers on both the federal and state claims and the damages award because of Texas law; we sustain the 42 U.S.C. Sec. 1983 liability of the City but modify the damages recovered against it.I. The Events of August 11, 1981
 
 
 2
 Shortly after 4:00 a.m. two Borger policemen signaled the driver of a pickup truck to stop because, according to them, they saw the vehicle veer across the street's center stripe and they identified it as one thought to be driven by Lonnie Cox. Cox was not known to the officers, but they had received reports that day of his involvement in some difficulty and they expected notification of a warrant that would justify his arrest. Cox was actually the one driving the pickup and had no passenger with him, although the officers could not have then known this to be so. When Cox refused to stop, three police patrol cars gave chase at high speeds, and gunfire erupted. No bullet struck the police cars, but many did strike the Cox vehicle and Cox was wounded. About seven miles east of Borger, Cox suddenly turned from the highway and went through a fence onto the 6666 Ranch. He drove south into the ranch and then turned to the east. The police officers came to an entrance into the ranch and drove across the cattle guard and on a caliche road for a distance of about 100 yards. The first three police units were quickly joined by two more.
 
 
 3
 The Cox vehicle had crossed the caliche road and stopped some 75 yards to the east near a cross fence. Down the caliche road about 200 yards further stood a house, although the officers said that they could not see it at the time of their arrival in the rainy darkness. When Cox left his pickup, there was more gunfire. Again, no bullets struck the police cars, but one police bullet did strike the ranch house.
 
 
 4
 In the house James C. Grandstaff and his family were awakened by the noise. James Grandstaff was the 31 year old foreman in charge of the north portion of this large ranch. His family included his wife, Lois Sharon Grandstaff, his minor daughter, Jo Cheryl Grandstaff, and two stepsons, Randy Glen and Charles Robert Gatlin. Grandstaff went to the window, saw the flashing lights of the police cars, and heard commands being shouted over a loud speaker. He quickly dressed and drove his own pickup down the caliche road to investigate the problem, no doubt thinking himself safe in the presence of so many law enforcement people. After he reached the police cars, saw the Cox pickup to the east and heard the call on the police loudspeaker for the one addressed being ordered to come out with his hands up, James Grandstaff drove back to his house to warn his family that the police were after someone who could possibly reach the area of the home. He left a gun with his oldest stepson, told him to lock the doors and let no one in the house, and then returned in his pickup to assist the police officers. As his pickup reached the patrol cars the second time, officers opened fire upon him from two sides. He managed to get out of his pickup but was shot in the back with a high powered rifle. Grandstaff was dead before he could be taken to a hospital. An hour later the wounded Lonnie Cox surrendered at the highway, after having hidden in an outbuilding near the Grandstaff home.
 
 
 5
 The dispatcher at Borger police headquarters made the following entries on her police radio log:
 
 
 6
 Time Nature of Transaction
---- --------------------------------
4:23 (3 units in pursuit)
 Chief advised subject firing
4:29 Left pickup in pasture . . .
 firing on them
4:33 Car coming out from house
 Don't know if it will be people
4:35 Vehicle backing up going back to
 house
4:40 Light just came on inside house
 Light now gone off
4:43 At present everything quiet
 Vehicle leave house again
4:47 Firing, man down, send ambulance
 
 
 7
 At the time of the firing there were five police cars in a line on the caliche road manned by six Borger policemen, composing the entire night shift of the force. All of the officers were heavily armed.
 
 
 8
 The plaintiffs sued four of the officers and the City seeking damages for a civil rights violation under Sec. 1983 as well as for state tort claims. After a two week trial, the jury found that the four officers were reckless in their gunfire, consciously disregarding a substantial and unjustifiable risk and that the use of that deadly force was maliciously, wantonly, or oppressively done. The jury further found that the City of Borger was grossly negligent in failing to properly train its police officers and that there was serious incompetence or misbehavior general or widespread throughout the City police force. The following damages were awarded:
 
 
 9
 1. To the estate $100,000 for the pain and suffering of James Grandstaff prior to his death.
 
 
 10
 2. To the widow, Lois Sharon Grandstaff, $250,000 for her pecuniary loss and $250,000 for her loss of society and mental anguish.
 
 
 11
 3. To the minor daughter, Jo Cheryl Grandstaff, $200,000 for her pecuniary loss and $250,000 for her loss of society and mental anguish.
 
 
 12
 4. To the father, Joe H. Grandstaff, $200,000 for his loss of society and companionship and for his mental anguish.
 
 
 13
 5. To Lois Sharon Grandstaff $100,000, to Randy Gatlin $25,000 and to Robert Gatlin $25,000, for their emotional injury sustained as the result of seeing the circumstances surrounding the shooting and death of James Grandstaff.
 
 
 14
 6. Punitive damages were awarded against the four officers--$3000 to Lois Sharon Grandstaff against each, $3000 to Jo Cheryl against each, and $1500 to Joe Henry Grandstaff against each.
 
 
 15
 Peace officers stand at the front of law and the ordering processes of society. They restrain the violator, protect the compliant, and represent constituted authority in the scenes of both peace and turbulence of community life. We depend heavily upon their skill and disposition. They deserve and require the understanding and support of judges as well as of all citizens. Where any officer fails--whether for lack of courage, judgment, integrity, or humaneness--all the community suffers. We suffer because vested authority has failed to prevent some harm or because authority has been sullied and abused. With any abuse of authority the entire ordering process is weakened. The public trusts the entire process less, and antagonism to all figures of authority rises. No one should be more alert to the cost of failure than responsible law enforcement officers and we who work in the courts. We must do what we can to avoid the failures, to prevent their reoccurrence, and--at all times--stay true to the requisites of honesty and accountability imposed upon all who are at once representative of the law and subject to it.
 
 
 16
 Our reading of this long trial record reveals how officers and a city police force failed, at great cost, and how those officers and their supervisors thereafter denied their failures and concerned themselves only with unworthy, if not despicable, means to avoid legal liability. The City and officers insist, to this day, that they are free of fault and deserve no blame. They display no sense of obligation other than to this joint disclaimer and defense. There is not a single word in this record about any effort at any time by the City of Borger to avoid police failure or abuse. The officers, called to the witness stand by the plaintiffs, were evasive and forgetful and self-contradictory. The scene at the 6666 Ranch that dark night in 1981 was distressing; succeeding events, the scene of this trial, and the posture of the defense only exacerbate the distress.[1]II. Liability of The Police Officers
 
 
 17
 The officers are liable under Texas law for the wrongful death of James Grandstaff. Even if the officers would have been justified under Texas law in using appropriate deadly force against Lonnie Cox, there could be no justification where an innocent third person was recklessly killed. Tex.Pen.Code Ann. Sec. 9.05 (Vernon 1974). The officers are likewise liable for Grandstaff's death on a federal civil rights claim, authorized by 42 U.S.C. Sec. 1983 where a person, acting under color of law, deprives another of rights assured by the Constitution or federal law. No less than Texas law, the Fourteenth Amendment protection against deprivation of life without due process of law is violated when police officers using deadly force, in conscious disregard of substantial risk of harm to innocent parties, kill an innocent third party. See Garner v. Tennessee, --- U.S. ----, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985) ("fundamental interest in [one's] own life need not be elaborated upon").
 
 
 18
 The jury found, and was entitled to find, that the defendant officers consciously disregarded a substantial risk to innocent persons, and that their use of deadly force was maliciously, wantonly or oppressively done. The evidence showed that the officers knew that third parties lived in the home from which the Grandstaff pickup came. They were aware of the possibility that an innocent resident of the house could have been in the pickup; the radio transmission at 4:33 a.m. contained a comment to the effect that they did not know if there would be "people" in the Grandstaff pickup. In testimony at the trial they admitted that they were aware of the possibility of Cox having obtained a hostage after he left his own vehicle. From their protected position in the path of the Grandstaff pickup, with five patrol units and six officers between the slow moving pickup and the exit, without awaiting any hostile act or sound, they poured their gunfire at the truck and into the person of James Grandstaff. They showed no inclination to avoid inflicting unnecessary harm upon innocent people. They simply saw a target and fired. Furthermore, the individual defendants, as peace officers of the state, were acting under color of state law. The findings of the jury are supported in the evidence.
 
 
 19
 The officers argue that without evidence and a finding that a particular defendant fired the shot that actually struck and killed Grandstaff, there can be no constitutional deprivation laid at the feet of any officer. They may as well argue that no one on a firing squad is responsible for the victim's death unless we know whose bullet first struck the heart. The firestorm that killed James Grandstaff was in all respects a joint operation: the same recklessness, the same circumstances, and the same object. Each participant was as much at fault as the others, and all are liable for the foreseeable consequences. Each officer who fired his gun encouraged others to do the same. The trial court instructed the jury: "You are instructed that anyone who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another, is regarded by the law as being just as responsible for the wrongful act as the one who actually committed it." Francis v. Kane, 246 S.W.2d 279, 281 (Tex.Civ.App.--Amarillo 1951, no writ); Anderson v. Nosser, 438 F.2d 183, 198 (5th Cir.1971), mod. on other grounds, 456 F.2d 835 (en banc), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972); Nesmith v. Alford, 318 F.2d 110, 119 (5th Cir.1963), cert. denied, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964).
 
 
 20
 That the officers acted in concert also answers the objection of the officers to the joint and several judgment. They argue that this was improper in light of Dobson v. Camden, 725 F.2d 1003 (5th Cir.1984), but the holding in Dobson was that the plaintiff recovered only for injuries inflicted by the use of excessive force and that the defendant who was not implicated or related to that wrong was not jointly liable for those damages.
 
 
 21
 The officers argue also that the plaintiffs failed to bear their burden of proving that the officers were not acting in good faith in the performance of discretionary duty and, therefore, the officers were entitled to their pleaded defense of qualified immunity. The answer to that argument is that the reckless use of deadly force was not within their discretionary authority and that the wanton and oppressive taking of a life violated clearly established law. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 316 (1982). The plaintiffs needed no additional jury findings.
 
 
 22
 The officers then argue that the jury did not find that the police officers' use of deadly force was a proximate cause of plaintiffs' damages. The jury found that the use of deadly force was a proximate cause of the damages sustained by James Grandstaff. There was a preliminary finding that the officers were justified in using deadly force against one believed to be Lonnie Cox, but that finding was nullified by the succeeding finding to the effect that the officers were not justified in this use of deadly force because, under all the circumstances, they acted recklessly. Without justification for their conduct, their use of deadly force was wrongful and it was found to be, as it would necessarily be, the proximate cause of the death of James Grandstaff.
 
 III. Municipal Liability
 
 23
 The City of Borger enjoys governmental immunity from the state tort claim. The liability of the City therefore depends upon the scope of 42 U.S.C. Sec. 1983. There is no respondeat superior liability of a municipality for the negligence, gross or ordinary, of an officer. There must be (1) a policy (2) of the city's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Bennett v. City of Slidell, 728 F.2d 762 (5th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 3476, 87 L.Ed. 612 (1985); Webster v. City of Houston, 735 F.2d 838 (5th Cir.) (en banc), rev'd. on other grounds, 739 F.2d 993 (5th Cir.1984) (en banc).
 
 
 24
 There was a deprivation of a constitutional right, as held above, when the officers took the life of James Grandstaff without due process of law. And the policymaker for the City is clearly identified; the City does not deny that the police chief was its sole policymaker. Our remaining inquiry is this: was there some policy or custom or action attributable to the police chief that was a cause of Grandstaff's death? By properly identifying the policy, we decide the inquiry in the affirmative.
 
 
 25
 (a) Inadequate training as cause: In Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court held that past constitutional violations by subordinates are not necessarily sufficient to prove a policy of the supervisor causally linked to subsequent constitutional deprivations. The Court could find "no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [certain named defendants]--express or otherwise--showing their authorization or approval of such misconduct." Id. at 371, 96 S.Ct. at 604, 46 L.Ed.2d at 569. The Supreme Court has elaborated on the causal requirement by holding that the connection must be more than de facto; the policy must be "the moving force of the constitutional violation." Monell, 436 U.S. at 694, 98 S.Ct. 2037, 56 L.Ed.2d at 638; see also Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).
 
 
 26
 An "inadequate" training program alone is not ordinarily the moving force behind an injured plaintiff's harm, because the police officer who injures the plaintiff does not rely upon inadequate training as tacit approval of his conduct. It is not enough that the city could, but does not, reduce the risk of harm to the plaintiff. See Milligan v. City of Newport News, 743 F.2d 227 (4th Cir.1984); Dunn v. Tennessee, 697 F.2d 121, 128 (6th Cir.1982), cert. denied, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983); Wilson v. Beebe, 612 F.2d 275 (6th Cir.1980); Watson v. Interstate Fire & Casualty Co., 611 F.2d 120 (5th Cir.1980); Kostka v. Hogg, 560 F.2d 37 (1st Cir.1977). Nor does it satisfy the causal link/moving force requirement to prove that a supervisor has failed to satisfy a general responsibility to supervise employees imposed by state law. But see Sims v. Adams, 537 F.2d 829 (5th Cir.1976).
 
 
 27
 The Supreme Court last spoke on the policy requirement of Sec. 1983 in Tuttle v. Oklahoma City, --- U.S. ----, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). In Tuttle, inadequate training was asserted as a basis of municipal liability under section 1983. Id. at ----, 105 S.Ct. at 2433. Justice Rehnquist, writing for the plurality, reserved the question whether a policy not itself unconstitutional, such as inadequate training, could be a policy under Monell. Id. at ---- n. 7, 105 S.Ct. at 2436 n. 7. Justice Rehnquist, however, wrote that until the Court answered that question a plaintiff relying on a policy not itself unconstitutional must have considerable proof that the policy was causally related to the constitutional deprivation, id. at ---- & n. 8, 105 S.Ct. at 2436 & n. 8, and that to be a policy, inadequate training must be a product of a conscious choice, id. at ---- & n. 7, 105 S.Ct. at 2436 & n. 7. Justice Brennan, writing for three justices, would not require that the city policy in itself be unconstitutional so long as the city is at fault for the damage suffered. He sees a more indirect causal link permitted by the statutory language providing that the victim must be "subjected" or "caused ... to be subjected" to the deprivation of constitutional rights by the liable party. Id. at ----, 105 S.Ct. at 2439.
 
 
 28
 We cannot know what conscious choices on the part of the city policymaker would carry the Court's policy/cause hurdle. It may not be enough that the policymaker demonstrates a conscious lack of concern whether the police force is well trained or poorly trained. We doubt that a finding of "gross" negligence in that training will always be the ticket to municipal liability. But see Turpin v. Mailet, 619 F.2d 196, 201-02 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); Reeves v. City of Jackson, 608 F.2d 644, 652-53 (5th Cir.1979); Owens v. Haas, 601 F.2d 1242, 1246-47 (2d Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
 
 
 29
 (b) The city policy/custom of dangerous recklessness: If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights. Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.
 
 
 30
 That was the rationale of this court in Languirand v. Hayden, 717 F.2d 220 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). Conscious indifference to widespread incompetence or misbehavior may be more than a matter of extreme negligence and more than a failure to instruct or train. If it is the deliberate police policy to demand instant compliance, heedless of rights and risks, abuses--i.e., incompetence and misbehavior--will occur when officers of varying judgment and stability encounter resistance. If unconfined the policy ordains use of the ultimate compulsion, the firearm, upon any appearance of resistance and with only imagined justification. That policy employs armed officers who subject the public to the deprivation of their constitutional rights. Where the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint, so as to endanger innocent third parties, the city should be liable when the inevitable occurs and the officers do so.
 
 
 31
 (c) The jury findings here: This trial was conducted in January of 1984, before the Bennett and Webster decisions of this court, and long before the opinions of the Supreme Court in Tuttle. The trial court had before it our writing in Languirand, and this was the basis of the instructions given to the jury and the interrogatories which composed the verdict. In this respect the City made no objection to the form of the interrogatories or to the court's charge (except on the ground of insufficiency of the evidence).
 
 
 32
 The jury found that "the city of Borger was grossly negligent in failing to properly train its police officers" and that "serious incompetence or misbehavior was general or widespread throughout the city of Borger police force." "Gross negligence" was defined in the court's charge as "more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it." The City's consciously indifferent training of its officers was found to be a proximate cause of James Grandstaff's death.
 
 
 33
 The verdict must be construed in the context of the evidence and the issues raised by the parties before the jury. The training, incompetence, and misbehavior of the Borger police placed at issue by this record implicate only the employment of deadly force with reckless disregard of the danger to human life. What the jury decided was that the City of Borger chief of police chose to operate a police force where prevalent recklessness endangered human life and safety, and that this policy choice caused Grandstaff's death.
 
 
 34
 (d) The evidence: There was no direct testimony of prior misconduct within the Borger police force or of prior knowledge and state of mind of the police chief. We know from Tuttle v. Oklahoma City, --- U.S. ----, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that isolated instances of police misbehavior are inadequate to prove the knowledge and acquiescence by a city policymaker in that manner of conduct. That is not our case, however.
 
 
 35
 An injured plaintiff is not likely to document proof of a policy or disposition, either of the policymaker or throughout the police force, that disregards human life and safety. The disposition must be inferred circumstantially from conduct of the officers and of the policymaker. Prior incidents of abusive police conduct tend to prove a pattern or custom and the accession to that custom by the policymaker. See Bennett, 728 F.2d at 768. But the plaintiff may encounter difficulties in making that proof, because of the lack of available credible witnesses and the avenues for dispute and distraction over the actual facts of each specific incident. No incidents prior to August 11, 1981 were proved here.
 
 
 36
 The evidence does prove repeated acts of abuse on this night, by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom. The entire six officers of the night shift of the City of Borger participated in this wild barrage, when the exercise of the least care and the use of any rational and organized plan would have avoided the death of James Grandstaff. They were quick to fire on the highway at Lonnie Cox, rather than at the tires of his truck. Perhaps they were returning his fire, although the jury could have found otherwise on this evidence. They kept firing at Cox in the pasture, even in the direction of the ranch house. Perhaps they were not then aware of the house, but the jury could have concluded otherwise.
 
 
 37
 The disposition of the policymaker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made.
 
 
 38
 This reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force. The policymaker's disposition, his policy on the use of deadly force, after August 11 was evidence of his disposition prior to August 11. See 2 Wigmore, Evidence Secs. 382, 437 (Chadbourn rev. 1979). As subsequent conduct may prove discriminatory motive in a prior employment decision, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and subsequent acts may tend to prove the nature of a prior conspiracy, see Anderson v. United States, 417 U.S. 211, 219, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974), so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.
 
 
 39
 After August 11, 1981, we all know of the dangerous recklessness of that police force. If the police chief had not known and approved of it beforehand, we would expect a change when he, too, learned the facts. But there is no sign of any concern except that the City avoid liability. The jury was entitled to infer that the conduct on the 6666 Ranch demonstrated the policy of the Borger city police force as approved by its policymaker, both before and after that time.
 
 IV. The Damages
 A.
 
 40
 The father of James Grandstaff, Joe H. Grandstaff, was awarded $200,000 for the loss of society and companionship and for mental anguish due to the death of his son. James was his only child and their relationship was a close one. He testified that his very life was destroyed by his son's death. We look to Texas law for guidance on the damages recoverable for James Grandstaff's death. See Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961). Texas allows a parent to recover for loss of society and companionship, and for mental anguish, whether or not there is any pecuniary loss. Sanchez v. Schindler, 651 S.W.2d 249 (Tex.1983). The prevailing view of Texas courts is that no distinction is made whether the deceased be a minor or adult child. Estate of Clifton v. Southern Pacific Transportation Co., 686 S.W.2d 309 (Tex.App.--San Antonio 1985, no writ); City of Houston v. Stoddard, 675 S.W.2d 280 (Tex.App.--Houston 1984, writ ref'd n.r.e.); Moore v. Lillebo, 674 S.W.2d 474 (Tex.App.--El Paso 1984, writ granted); Bradley v. Quality Service Tank Lines, 654 S.W.2d 562 (Tex.App.--Fort Worth), rev'd on other grounds, 659 S.W.2d 33 (Tex.1983). Contra Piper Aircraft Corp. v. Yowell, 674 S.W.2d 447 (Tex.App.1984--Fort Worth, writ granted). To recover for mental anguish there need be no physical manifestation proved. Missouri Pacific Railroad v. Vlach, 687 S.W.2d 414 (Tex.App.1985--Houston, no writ). The damage award of Joe Grandstaff was proper.
 
 B.
 
 41
 James Grandstaff's widow and stepsons recovered damages against the City and the officers for their own emotional injuries suffered as bystanders when they witnessed the gunfire directed at Grandstaff in his pickup truck. We conclude that, under Texas law, this recovery is proper against the officers, but that it is not permitted under Sec. 1983 and may not therefore be recovered from the City.
 
 
 42
 To recover for the tort of negligent infliction of emotional distress to a bystander, Texas courts require that the bystander be closely related to the victim and that the bystander suffer an emotional trauma as the result of a contemporaneous perception of the event from a nearby location. Landreth v. Reed, 570 S.W.2d 486 (Tex.Civ.App.--Texarkana 1978, no writ); Genzer v. City of Mission, 666 S.W.2d 116 (Tex.App.--Corpus Christi 1983, writ ref'd n.r.e.); Dawson v. Garcia, 666 S.W.2d 254 (Tex.App.--Dallas 1984, no writ); Haught v. Maceluch, 681 F.2d 291 (5th Cir.1982). The two stepsons were minors living with the James Grandstaff family, and we believe they stood in the close relationship required by Texas law. See Genzer, 666 S.W.2d at 122 (court looked to closeness of relationship, not degree of consanguinity, between victim and her grandparents in allowing grandparents to recover).
 
 
 43
 We fail to see, however, that these bystanders have proved an independent cause of action under Sec. 1983. Negligent infliction of emotional distress is a state common law tort; there is no constitutional right to be free from witnessing this police action. "Section 1983 imposes liability for violation of rights protected by the Constitution, not for violations of duties of care arising out of tort law." Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695-96, 61 L.Ed.2d 433 (1979). Lois Sharon Grandstaff, Charles Robert Gatlin, and Randy Gatlin may not recover these damages from the City of Borger.
 
 V. Judgment
 
 44
 The judgment of the district court is affirmed in all respects except for the recovery from the City for the emotional injury to Lois Sharon Grandstaff and to Randy and Robert Gatlin as bystanders. The case is remanded to the trial court to modify the damage award, to assess attorney's fees and costs expended in this appeal, and to consider the applicability of the recent Texas Supreme Court's decision on prejudgment interest. Cavnar v. Quality Control Parking, --- S.W.2d ---- (28 Sup.Ct.J. 466, June 5, 1985).
 
 
 45
 AFFIRMED IN PART; MODIFIED IN PART, AND REMANDED.
 
 
 46
 GARWOOD, Circuit Judge, dissenting in part.
 
 
 47
 I respectfully dissent from the affirmance of the judgment against the City. I agree with the general test set forth by the majority for municipal liability under 42 U.S.C. Sec. 1983 in cases of this kind:
 
 
 48
 "If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."
 
 
 49
 However, the majority goes on to hold that the existence of such policy level "instruction or example or acceptance" can be inferred here because after the event there was "no sign of any concern except that the city avoid liability." As a logical, factual matter this is simply too big a leap, given the absence of evidence of any prior actual or claimed reckless action by Borger police or of any prior conduct by Borger officials which could fairly be considered an authorization, approval or condonation of police recklessness. Surely a police chief's unexpressed "preexisting disposition" is not a city "policy" within the majority's, or any other reasonable, definition. There is no evidence of any prior expression of the inferred "preexisting disposition." We are seeing cloud castles. A "policy" has been created out of thin air. What we are really doing is punishing the City, not for wrongfully or unconstitutionally bringing about this tragedy, but for its post-event callousness. That is not actionable under section 1983, and even if it were, none of the kind of damages awarded here would be recoverable for it. Accordingly, I dissent.*
 
 
 
 [1]
 Officer Ray testified that Cox fired from his pickup in the pasture, but Ray told the chief of police on the morning after the event that he was not sure he received any gunfire at that time. Ray testified that after the Grandstaff pickup came down the road the second time, from the front of the headlights he saw through the drizzle the silhouette of a person getting out of the pickup. He said he shot at the silhouette because "the individual started making movements around his waist area, like he ... an individual would make going for a gun." Though he was still a Borger police officer at the time of the trial, Ray testified that his conduct on this occasion had never been criticized
 Officer Turner had difficulty in recalling the events and contradicted what he had said to the chief of police on August 11 as well as what he had testified in his deposition. He had told the police chief that there was a yard light at the Grandstaff house and in its light he saw Cox run up to a vehicle at the house after Cox had abandoned his pickup. But he testified at trial that this was incorrect, and he did not see or know the house was there at that time. About these contradictions he said: "I was very confused and it's all out of order and I would just as soon you not even use it [the statement to the police chief] because it is out of order." He testified that when Grandstaff got out of his pickup and turned around "he was motioning like he was going for something in his waist band, trying to go for a weapon." For this reason, Turner testified that he shot at the person with the intent to kill.
 A .41 caliber bullet was extracted from the Grandstaff bedroom wall. Officer Roberts, who led the chase into the ranch, was the only Borger officer with a weapon that could have fired that bullet. Roberts testified that he did not fire at Cox, that his pistol was never examined, and that he had sold it. Officer Alonzo testified that he had no discussion with Roberts about Roberts' handgun that could fire the bullet found in the Grandstaff house. In his deposition he said that he asked Roberts about this very fact.
 Alonzo testified that he was in the pasture to the east of the vehicle, and on its right side, as the Grandstaff pickup came down the road the second time; and when the shooting by others began, he heard over the volley of gunfire Officer Davis say on the public address that the subject was trying to get to the back of his vehicle. Alonzo explained that he fired his M-14 automatic rifle into the truck to show the subject that he was surrounded; and while he could not see the person, he hoped this would induce him to surrender. Four bullets struck the right side of the truck bed, and another shattered the glass at the rear of the cab.
 Deputy Sheriff Ricky Morris arrived at the ranch toward the end of these events. He heard only one gunshot as he left the highway. The Borger officers had an explanation for this. Officer Davis, who had transmitted the message on the radio to the dispatcher that a man was down, testified that he went to the left side of the pickup to find Grandstaff lying facedown, groaning, with his left hand under his body. Concerned about what might be in that left hand, he said to his fellow officers: "I'm going to fire one warning shot to see if we can get a reaction out of the gentleman to show him that we were there and we meant, you know, for our own safety protection and his." Davis said he then fired into the ground as he stood over Grandstaff. Officer Ray confirmed this, saying that after Grandstaff lay on the ground he was still fumbling at his belt with his hand beneath him and that Davis fired a shot so that he would "get his hands out from underneath him." Officers Turner and Roberts agreed that this happened. Roberts said that he heard Davis shout: "Everybody hold your fire. Don't shoot. I'm going to fire a round into the ground to see if I can get him to move his hands out from underneath himself." The picture they give is of a man lying facedown in the dirt, having gone down as the target of the broadside of these officers, needing an extra shot for the sake of due attention.
 Officer Davis said that except for one other shot, his was the only one he heard.
 When the plaintiffs completed their case-in-chief and rested, the City rested without calling any witnesses. The chief of police did not testify.
 
 
 *
 As I would hold that the City's liability has not been established, I do not reach the perhaps even more difficult question of whether a nondependent parent can recover under section 1983 for grief over the death of a married adult child maintaining a separate household. Such recovery has apparently been authorized under the Texas Wrongful Death statute since 1983. See Sanchez v. Schindler, 651 S.W.2d 249 (Tex.1983). Section 1983 recovery is limited to "the party injured," the "citizen" whose federal rights have been invaded. However, in Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), we relied on 42 U.S.C. Sec. 1988 as authority to look to state survival and wrongful death statutes in section 1983 actions because "in a very real sense" this "does not do more than create an effective remedy" and "merely assures that there will be a remedy." Id. at 409. Given that the nature of the damages awarded the father here were generally not recoverable when sections 1983 and 1988 were enacted, see Michigan Central R.C. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913); Sanchez v. Schindler, 651 S.W.2d at 255 (dissenting opinion); Restatement (Second) Torts Sec. 925, comment e, and, unlike pecuniary loss or survival damages, can in no "real sense" be regarded as some sort of rough proxy for the deceased's damages, there is room for doubt that section 1988 or the Brazier rationale warrant such recovery merely because it has now become, over a century later, available under state law. Whether the father is entitled to such a recovery apart from state law is an open question in this Circuit. See Logan v. Hollier, 711 F.2d 690 (5th Cir.1983). Other authorities are divided. Compare Jackson v. Marsh, 551 F.Supp. 1091 (D.Colo.1982) and White v. Talboys, 573 F.Supp. 49 (D.Colo.1983) (no recovery) with Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir.1984) and Myres v. Rask, 602 F.Supp. 210 (D.Colo.1985) (recovery). In contrast to the protections afforded the spousal and parent-minor child relationships, the common law did not recognize any action for injury to the parent-adult child relationship. See Restatement (Second) Torts Sec. 703, comment f. See also Sec. 699. Cf. Secs. 683, 693 (spousal); Secs. 700, 701, 703 (parent-minor child). Although the Constitution may protect some aspects of the parent-adult child relationship, so that section 1983 damages may be recoverable where the illegality of the complained of governmental action consists, in whole or in part, of interference with or failure to give proper recognition to that relationship as such, cf. Brantley v. Surles, 718 F.2d 1354 (5th Cir.1983) (public school employee discharged for child's attendance at private school), it does not necessarily follow that such damages are recoverable where, as here, the parent-adult child relationship is only fortuitously and indirectly related to the wrongdoing