Edward SKIBO and Charles
Musumeci, Plaintiffs,

v.

The CITY OF NEW YORK, et
al., Defendants.

Larry TAYLOR and Catherine
Taylor, Plaintiffs,

v.

The CITY OF NEW YORK, et
al., Defendants.

Nos. 84CV1414, 80 CV 3185.

United States District Court,
E.D. New York.

Oct. 24, 1985.

Seth D. Friedland, Friedland, Laifer &
Robbins, New York City, for plaintiff Musumeci.

Myron Beldock, Beldock Levine & Hoffman, New York City, for plaintiffs.

Frederick A.O. Schwartz, Jr., Corp. Counsel of the City of New York, New York City, by Charlotte Biblow and Robert Trachtenberg, Asst. Corp. Counsel, for defendants.

SHIRA A. SCHEINDLIN, United States Magistrate.

Plaintiffs in these two actions are represented by the same attorney, as are defendants. Because the identical information is sought by plaintiffs in both cases, I am filing a single order.

## I. FACTUAL BACKGROUND

### A. *The Skibo Case*

Plaintiffs Edward Skibo and Charles Musumeci brought a civil rights action pursuant to 42 U.S.C. §§ 1983, 1985(3) (Supp. V 1981) seeking damages from the defendants, the City of New York and police officers employed by the City of New York. They seek redress for their alleged false arrest on April 11, 1983 and the excessive force used against them at that time. Plaintiffs allege that the officers conspired to take such actions against them and that they were prosecuted and charged without probable cause in violation of their civil rights. Complaint ¶ 18.

On April 11, 1983 Thomas Skibo, age 21, plaintiff Edward Skibo's son and the nephew of plaintiff Charles Musumeci, was shot and killed in a clothing store at 9221 Third Avenue, Brooklyn. After the shooting, the defendant officers entered the premises, as did plaintiffs. According to plaintiffs, the police at the scene refused to tell them who was in charge of the matter or to provide them with any information even though they informed the police of their relationship to the dead youth. Eventually Musumeci became involved in a heated exchange with the police. The police then rushed the plaintiffs, threw them down, handcuffed them and placed them under arrest without a warrant and without probable cause. Complaint at ¶ 17.

Plaintiffs were then transported to the 68th precinct where they were detained. Subsequently, the police brought plaintiffs to Central Booking, where they allege further harassment. Complaint ¶ 23. Plaintiffs were charged and prosecuted in Kings County Criminal Court. On November 25, 1983 the Honorable Margaret Cammer dismissed all criminal charges against plaintiffs.

In addition to alleging a conspiracy among the police officers, plaintiffs assert that the officers acted with the knowledge and under the supervisory authority of defendant City of New York. Plaintiffs contend that the defendants' actions resulted from a de facto policy of the City of New York to punish civilians who question police orders, whether lawful or unlawful. Plaintiffs also maintain that the City has not disciplined officers who engage in these practices, and has not effectively trained officers in dealing with the public.

### B. *The Taylor Case*

Plaintiffs Larry Taylor and his wife brought this action pursuant to 42 U.S.C. § 1983 and § 1985(2) and (3) (Supp. V 1981). They allege that defendants conspired to secure by fraudulent means the conviction of plaintiff Larry Taylor for constructive possession of cocaine and thereby violated his civil rights.

On November 17, 1977 two teams of officers entered the "Larry T Bar" in Brooklyn with a search warrant and conducted a systematic search. *People v. Taylor*, No. 4005/77 at 3 (N.Y.Sup.Ct., Crim. Term, August 25, 1982). The officers found narcotic contraband on the premises. This contraband was vouchered with defendant Police Officer Andersson. *Id.*

Plaintiff Larry Taylor, the owner of the bar, entered the bar during the search and complained about the way in which it was being conducted. *Id.* He resisted a request by defendant Sergeant McGoewn that he open the liquor storage closet. Plaintiff claimed that he alone had access to it and that it was not a proper area for a search. *Id.* 3–4. Subsequently, the offi-

cers ordered plaintiff to leave the premises and proceeded to conduct a thorough search of the closet. *Id.* at 4. The City claimed that Officer Stripp found a plastic bag containing over one half ounce of cocaine on a shelf in the liquor closet. *Id.*

The police arrested plaintiff on December 12, 1977. He was released later the same day when an undercover officer stated that he was not the individual sought by the police during the November 17 raid. In January, 1978, plaintiff was rearrested pursuant to a December 16, 1977 indictment charging constructive possession of the cocaine found during the November raid. In June 1978, plaintiff was convicted by a jury of criminal possession of cocaine and was sentenced on August 22, 1978 to an indeterminate term not to exceed three and one half years. The crucial evidence against plaintiff was the bag of cocaine found at the bar. *Id.* at 6. On August 25, 1982, Justice James Starkey granted plaintiff's *coram nobis* motion to vacate the state court order pursuant to New York Crim. Proc.Law § 440.10 (McKinney 1984).

A hearing on the motion was ordered when the Brooklyn District Attorney's office discovered a handwritten amendment to police department vouchers of the contraband seized in the Larry T Bar. The amendment gave a new and different description of where the plastic bag containing cocaine had been found and by whom. The state court in deciding the 440 petition, found the handwritten amendment to be in violation of police department procedures. *Id.*

The "startling result" of the hearing, however, was that Officer Andersson recanted and repudiated his trial testimony. He had testified that as "vouchering officer" he had received the bag of cocaine from Officer Stripp, had placed it in a separate envelope, and had endorsed the envelope. When Officer Andersson first testified at the hearing on the motion to vacate the conviction, he repeated his trial testimony. That testimony was later corroborated at the hearing by Officer Stripp and Sergeant McGoewn, both of whom tes-

tified that they had seen Officer Andersson write the information on the envelope. *Id.* However, when Officer Andersson was recalled as a witness at the hearing he recanted his previous testimony. *Id.* at 7. He stated that he had not made the endorsement on the envelope and he did not recognize the handwriting. *Id.*

Justice James G. Starkey concluded that Officer Andersson's trial testimony was "false, either intentionally or recklessly, in a way that had a direct bearing on a significant and substantial question." *Id.* As a result of Justice Starkey's findings, the People's motion to dismiss the criminal charges against Larry Taylor was granted by Justice Michael Curci in Supreme Court, New York County on May 31, 1984. Plaintiffs' Motion for Leave to File Supplemental Complaint at 10.

Plaintiffs now allege that the police officers who searched the bar on November 17, 1977, later conspired to wrongfully convict plaintiff Larry Taylor of criminal possession of cocaine. Plaintiffs claim that the police conspired to arrest Larry Taylor twice because he had filed formal complaints with the police department concerning the police officers' conduct during the November 17, 1977 search of the bar. Plaintiffs further alleged that some of the officers involved in the raid removed liquor from the bar and destroyed the premises. The Internal Affairs Division of the police department conducted an investigation into these allegations.

### C. *Plaintiffs' Discovery Request*

Plaintiffs in both cases now request the production of the Internal Affairs Division ("IAD") procedural manual and the internal evaluations of IAD effectiveness. In addition, plaintiffs in *Taylor* seek information regarding all citizen complaints against police officers in Brooklyn North Narcotics during 1978 to 1983 while plaintiffs in *Skibo* request the same information concerning complaints against all officers in the 68th precinct during 1979–1984. Defendants assert that the IAD manual and evaluations are protected by the executive

and self critical analysis privileges. Defendants also seek a protective order as to the complaint files because production would be burdensome and would result in the disclosure of confidential information.

## II. DISCUSSION

### A. *The IAD Manual and Evaluations*

The Federal Rules of Civil Procedure allow discovery of "any matter not privileged which is relevant to the subject matter involved in the pending action," including material that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Defendants' claims of executive privilege and the privilege of self critical analysis are controlled by Federal Rule of Evidence 501, which provides that:

> [e]xcept as otherwise required ... the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege ... shall be determined by state law.

*Id.*

█ The existence of a privilege in cases raising a federal question is governed by federal common law. *See Brown v. Matias,* 102 F.R.D. 580 (S.D.N.Y.1984); *Lora v. Board of Education of the City of New York,* 74 F.R.D. 565 (E.D.N.Y.1977). However, "a strong policy of comity between state and federal sovereignties.... impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Lora,* 74 F.R.D. at 576, (quoting *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976)). A balance between the state and federal interests is required to determine whether the defendants' assertion of privilege should prevent disclosure of the IAD procedural manual and the internal evaluations of IAD effectiveness.

In *United States v. King,* 73 F.R.D. at 105, Chief Judge Weinstein enunciated a federal common law balancing test to determine when the need for disclosure outweighs the values of the privilege asserted. The four factors to be balanced are: 1) the federal government's need for the information to enforce its substantive and procedural policies; 2) the importance of the state policy that supports the rule of privilege and the likelihood that the recognition of that privilege will advance that policy; 3) the special need of the litigant who seeks disclosure of the information, and, 4) the adverse impact on local policy that would result from non-recognition of the privilege in the particular case. *Id.* at 105.

### 1. *The Federal Need*

█ The federal interest in the full development of the facts should be given the greatest weight in the balancing test. *United States v. King,* 73 F.R.D. at 105; *Lora,* 74 F.R.D. at 578. Such disclosure serves the "paramount public interest in the fair administration of justice ..." *Lora,* at 578. In a federal civil rights action, a claim that the evidence is privileged "must be so meritorious as to overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action ..." *Wood v. Breier,* 54 F.R.D. 7, 13 (E.D.Wis.1972). *See also Lora,* 74 F.R.D. at 579.

Plaintiffs' allegations of police misconduct and of the city's acquiescence in and support of the officers' illegal acts in both cases lends support to the government's interest in compelling disclosure of the documents requested. In addition to the full development of the facts and protection of the plaintiffs' civil rights, the federal government has an interest in maintaining the integrity of state and federal law enforcement institutions. Misconduct by individual officers, incompetent internal investigations, or questionable supervisory practices must be exposed if they exist.

### 2. Plaintiffs' Need for the IAD Procedural Manual and Effectiveness Evaluations

For the purpose of this discussion, plaintiffs' needs are the same. In both cases plaintiffs claim that they need the IAD procedural manual and the evaluations of IAD effectiveness to substantiate their allegations that supervisory personnel knew that police misconduct frequently resulted in civil rights violations. Plaintiffs assert that they need this information to establish the liability of the city and of the individual officers for such violations.

Plaintiffs allege that the officers' unconstitutional acts occurred as a result of a governmental custom or policy thereby establishing the basis for municipal liability. *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The issue of a municipality's liability under § 1983 was recently addressed in *Tuttle v. Oklahoma City,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Justice Rehnquist, writing for the plurality, held that isolated incidents of police misconduct are insufficient to prove knowledge and acquiescence by the city policymakers in such conduct. There must be, "at the very least ... an affirmative link between the policy and the particular constitutional violation alleged." *Id.,* 105 S.Ct. at 2436. In *Grandstaff v. City of Borger, Texas,* 767 F.2d 161, 170 (5th Cir.1985), the court held that this "affirmative link" requirement is satisfied where police officers know at the time they act unconstitutionally that their actions, "in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policy makers."

The Second Circuit has held that

an official policy can be inferred from the ommissions of a municipality's officials as well as from their acts. The issue of authorization, approval or encouragement is generally one of fact, not law. For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their sub-

ordinates, but fail to take remedial steps the municipality may be held liable....

*Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), *cert. denied sub nom. Turpin v. City of West Haven,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Thus reading these cases collectively, the plaintiffs are attempting to demonstrate that the City tolerated improper conduct and the officers knew it.

In both *Skibo* and *Taylor,* plaintiffs have demonstrated their need for the evaluations of IAD investigations. In a recent civil rights case, *Spell v. McDaniel,* 591 F.Supp. 1090 (E.D.N.C.1984), the court considered plaintiff's similar claim of need. As in the instant dispute, the plaintiff in *Spell* argued that "records of complaints filed, investigations conducted and reports written for internal and external use, and allegations of abuse and unreasonable force within the Fayetteville Police Department" would evidence a pattern of violent behavior. *Id.* at 1114. The plaintiff further argued that the pattern of behavior would show that supervisory defendants knew or should have known of police abuses, but failed to take corrective action.

The essence of the plaintiff's complaint is that the supervisory defendants were grossly negligent or deliberately indifferent in failing to provide adequate training, supervision and discipline to officers on the police force.... To prove this allegation the court agrees with plaintiff that it would be relevant, indeed critical, to establish what the defendants knew regarding allegations of police brutality and when they knew it.

*Id.* at 1115. *See also Culp v. Devlin,* 78 F.R.D. 136 (E.D.Pa.1978); *Norton v. McKeon* 444 F.Supp. 384 (E.D.Pa.1977). Ultimately, the court found the material essential to plaintiff's preparation of the case for trial, and thus discoverable.

My *in camera* review of the IAD procedural manual reveals that it contains information that plaintiffs need to determine whether adequate techniques are used to investigate complaints against police officers, an issue that must be resolved in both

cases. Such a determination is crucial in order for plaintiffs to establish their theory that the city maintains a policy of supervisory indifference to and tacit approval of police misconduct which was the "moving force" behind defendants unconstitutional acts. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037.

### 3. *Policy Behind the Privilege*

■ Defendants are not entitled to a protective order unless they can demonstrate a strong countervailing public policy in support of the asserted privilege. *Lora,* 74 F.R.D. at 579. *See also Wood v. Breier,* 54 F.R.D. at 7, 10. The defendants assert that both the manual and evaluations are protected by the self critical analysis privilege and executive privilege.

"The executive privilege is the government's privilege to prevent disclosure of certain information whose disclosure would be contrary to the public interest." *Frankenhauser v. Rizzo,* 59 F.R.D. 339, 342 (E.D. Pa.1973). The defendants assert that the effectiveness of the police department in detecting and investigating police corruption would be greatly diminished if the IAD techniques were disclosed. Defendants further allege that evaluations of the IAD provide the police department with candid information and that disclosure would hinder the department's ability to continue effective internal investigations.

The defendants correctly assert that the executive privilege is qualified, not absolute. Thus, the court must balance competing factors to determine whether the privilege prohibits discovery. Chief Judge Weinstein cited five criteria to be considered by courts when determining whether material that ordinarily falls within the scope of the executive privilege should be disclosed: 1) relevance of the evidence sought to be protected; 2) availability of other evidence; 3) seriousness of litigation and issues involved; 4) role of government in litigation; and, 5) possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *In re Franklin Nat'l Bank*

*Securities Litigation,* 478 F.Supp. 577, 583 (E.D.N.Y.1979).

As noted earlier, these documents are the only available source of the information sought. Unlike the situation where an officer has disclosed sensitive information under a promise of confidentiality, there is no actual or future threat to IAD officers who have produced the procedural manual or conducted internal IAD evaluation. Contrary to defendants' policy arguments, the public interest in investigating police department corruption and incompetence would be served, rather than hindered, by disclosure of the requested information. In a similar context, Judge George C. Pratt stated:

No legitimate purpose is served by conducting the investigations under a veil of near-total secrecy. Rather, knowledge that a limited number of persons, as well as a state or federal court, may examine the file in the event of civil litigation may serve to insure that these investigations are carried out in an evenhanded fashion, that the statements are carefully and accurately taken, and that the true facts come to light, whether they reflect favorably or unfavorably on the individual police officers involved or on the department as a whole.

*Mercy v. County of Suffolk,* 93 F.R.D. 520, 522 (E.D.N.Y.1982).

■ Defendants further assert that the materials are protected by the self critical analysis privilege. The policy behind the privilege is "to assure that subordinates within an agency will feel free to provide the decision maker with their uninhibited opinions and recommendations ..." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980). The public has a strong interest in the police department's ability to investigate its personnel and improve its procedures. Courts have, however, determined that the self-critical analysis privilege "is not absolute.... Consequently, a court must weigh the competing interest militating for and against disclosure of the privileged information." *Mobil Oil Corp. v. Dep't of*

*Energy,* 520 F.Supp. 414, 417 (N.D.N.Y. 1981).

Plaintiffs' need for the material and the need for accurate judicial fact-finding must be balanced against the city's concern that disclosure would have a chilling effect on the police department's self examination. *Id.* at 417. Here, plaintiffs have substantially demonstrated their need to see the documents. Further, because the government has a vital interest in upholding the civil rights of the populace, impediments to judicial fact-finding in a § 1983 case are not favored. *United States v. King,* 73 F.R.D. at 105. In addition, courts have declined to apply the privilege of self critical analysis when the proponent of the privilege fails to show that the process would be curtailed if discovery is allowed. *O'Connor v. Chrysler Corp.,* 86 F.R.D. 211 (D.Mass.1980). The police department needs to continue to monitor itself to ensure that department procedures are effective and that officers are complying with these procedures. It is unlikely that production of the manual and evaluations would halt this self analysis process. Thus, I find that the privilege of self critical analysis does not protect disclosure of the IAD manual or effectiveness evaluations.

### 4. *Adverse Impact on Local Policy*

Defendants claim that "any disclosure of IAD investigation methods and internal procedures will effectively diminish and possibly destroy IAD effectiveness." *See* Affidavit of John Guido, Chief of Inspec-

tional Services Bureau at 2. Defendants further contend that the disclosure of the documents would produce "a chilling effect on the authors of the reports." *Id.* at 3.

Defendants' apprehensions are significant. Nonetheless, it is unlikely that disclosure would inhibit IAD effectiveness or the willingness of officers to report truthfully. In my view plaintiffs' overwhelming need for the material clearly outweighs defendants' concerns regarding secrecy.

### B. *The CCRB Complaints*

Plaintiffs in *Skibo* request Civilian Complaint Review Board ("CCRB") files concerning complaints against all officers in the 65th precinct for the years 1979 to 1984. The total number of officers assigned to the 65th precinct during that time period was 1,093. Plaintiffs in *Taylor* seek similar information regarding complaints against all officers in Brooklyn North Narcotics for the years 1978 to 1983. The number of officers assigned to that command during those years was 276. The City opposes production of these files asserting the executive privilege and the burden of production.

As discussed above, the courts have applied a balancing test to determine when the need for disclosure outweighs the values of the privilege asserted. *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976). Using the *King* analysis it is my determination that plaintiffs' need for the CCRB files outweighs the claims of the executive privilege.[1]

1. The first factor in the *King* balancing test is the federal government's need for the information to enforce its substantive and procedural policies. Because the government has a strong interest in safeguarding citizens' civil rights and upholding the integrity of state law enforcement institutions, impediments to the full disclosure of the facts in a § 1983 case are not favored. *United States v. King,* 73 F.R.D. at 105.

The second factor that must be examined is the importance of the state policy that supports the rule of privilege and the likelihood that the recognition of the privilege will advance that policy. Defendants claim that the state has an interest in encouraging police officers to make statements during complaint investigations.

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel at 10. Examination of the CCRB files will serve rather than hinder this policy because disclosure ensures that investigations are carried out in a more equitable manner. *See Mercy v. County of Suffolk,* 93 F.R.D. at 523.

The third factor is the special need of the litigant who seeks disclosure of the information. In order for plaintiffs to establish their theory that the city has a policy of failing to adequately investigate and discipline police officers who violate citizens' civil rights, they need to examine the CCRB files. If the files reveal that such a policy exists, it would amount to the city's tacit approval of the officers' unconstitutional acts.

Defendants also maintain that producing the CCRB files would be unduly burdensome. In *Culp v. Devlin*, 78 F.R.D. 136 (E.D.Pa.1978), a § 1983 case, the court ordered the Mayor and Police Commissioner of the City of Philadelphia to produce documents similar to those requested here by plaintiffs. Defendant distinguishes *Culp* by arguing that there the plaintiff specifically charged negligence by the City of Philadelphia. The document requests were limited to complaints alleging conduct similar to that charged in the *Culp* lawsuit. Defendants' Memo at 10.

In *Skibo* and *Taylor* plaintiffs have specifically alleged that complaints made to the CCRB often are improperly or inadequately investigated. Plaintiffs base these accusations on the manner in which their complaints regarding perceived police misconduct were treated. Therefore, plaintiffs are seeking all CCRB files relating to officers in a particular precinct or area.

After *Tuttle*, ―― U.S. ――, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), a city is shielded from liability in a § 1983 case where only isolated incidents of unconstitutional activity are proven. However, if a city fails to either punish officers or change procedures after particularly egregious police conduct, this subsequent acceptance of the dangerous behavior by the policymaker tends to prove a preexisting policy. *Grandstaff*, 767 F.2d at 170. In *Grandstaff*, decided after *Tuttle*, the City of Borger, Texas took no action against several officers after they mistook an innocent victim for a fugitive and killed him. The Court of Appeals noted that if an episode such as this could go without attention by the City, the jury was entitled to conclude that unconstitutional police conduct was knowingly tolerated in the past as well. Thus, in *Grandstaff*, the court held that a jury could find an unconstitutional municipal policy from the City of Borger's failure to take action after only one serious incident. If plaintiffs here can establish that the City of New York has failed to properly investigate and eventually discipline officers engaged in unlawful behavior in tens or even hundreds of cases, then the rationale of *Grandstaff* is surely applicable. Tolerance of unconstitutional conduct is tantamount to encouragement of such conduct and is therefore a basis for municipal liability.

The court in *Culp* recognized the burden on the defendants in producing the documents. Nonetheless, that court found that plaintiff's need for the information outweighed the claimed burden. Similarly, this court recognizes the substantial burden placed on defendant if required to produce hundreds of CCRB files. However, I find, as did the court in *Culp*, that plaintiffs' need for this review outweighs the burden on the defendant.

Nonetheless, plaintiffs' request to examine over 1300 files is simply too burdensome. A random sample of the complaints against officers in both precincts should serve plaintiffs' purposes. Therefore, Brooklyn North Narcotics shall turn over to the Corporation Counsel 150 personnel files from the years 1978 to 1983. The files will be pulled in alphabetical order using every other letter of the alphabet. The 68th precinct shall turn over to the Corporation Counsel a total of 150 personnel files from a) officers currently assigned to the 68th precinct who were also there during the years 1979–1984 and b) officers assigned to the 68th precinct during 1979–1984 but who are not currently assigned to the precinct. These files shall also be retrieved in alphabetical order using the opposite set of letters. The Corporation Counsel will then pull the CCRB files, if any, relating to these officers. All iden-

---

The fourth factor in the *King* analysis is the adverse impact on local policy that would result from nonrecognition of the privilege in the particular case. Defendants fear that disclosure of the CCRB files may hamper the Police Department's efforts to obtain information concerning misconduct and corruption from members of the Department. Defendants' Memo at 10. However, my review of CCRB files indicates that they rarely contain such information. Furthermore, plaintiffs' need to uncover possible evidence of misconduct on the part of the City overcomes defendants' need for confidentiality.

tifying information shall be redacted from those files which shall then be made available to plaintiffs for their review.

CONCLUSION

■ Plaintiff has demonstrated a sufficient need for the IAD procedural manual, the internal IAD effectiveness evaluations and the CCRB complaint files which outweighs the value of the self-critical analysis and executive privileges. Also, plaintiffs' need for the CCRB files outweighs defendants' claim that production is unduly burdensome. I therefore order that defendants produce the IAD procedural manual, the internal IAD effectiveness evaluations and the CCRB files as set forth above.

SO ORDERED.