Lois Thurston KIBBE, Administrator of the Estate of Clinton Thurston, Plaintiff, Appellee,

v.

CITY OF SPRINGFIELD, Defendant, Appellant.

No. 85–1078.

United States Court of Appeals, First Circuit.

Argued Sept. 11, 1985.

Decided Nov. 27, 1985.

Edward M. Pikula, Asst. City Sol., with whom Richard T. Egan, City Sol., Harry P. Carroll, Deputy City Sol., Springfield Mass., were on brief for defendant, appellant.

Terry Scott Nagel, Springfield, Mass., on brief for plaintiff, appellee.

Before COFFIN, Circuit Judge, WISDOM * and ALDRICH, Senior Circuit Judges.

COFFIN, Circuit Judge.

Appellee Lois Thurston Kibbe, administratrix of the estate of Clinton Thurston, filed this suit under 42 U.S.C. § 1983 alleging that appellant City of Springfield and a number of its police officers deprived Thurston of his civil rights in a motor vehicle pursuit that ended with a police officer shooting Thurston in the head, causing his

* Of the Fifth Circuit, sitting by designation.

death. The jury returned verdicts against the police officer who fired the fatal shot and against the City, but found for three other officers.[1] It awarded one dollar in compensatory damages and five hundred dollars in punitive damages against the officer and compensatory damages in the amount of fifty thousand dollars against the City. Appellant challenges the district court's refusal to grant either a directed verdict or judgment notwithstanding the verdict, and also claims error in the jury charge.[2] For reasons we discuss below, we affirm.

### 1. *Factual Background*

At about 6:30 p.m. on September 28, 1981, the Springfield Police Department received a phone call on its 911 emergency line reporting a violation of a restraining order. A cruiser was sent to investigate. A second call about an hour later reported that the subject of the restraining order had called the apartment and threatened to come after its occupants with a knife. Another cruiser was dispatched. A third call reporting that the subject was breaking down the door and a fourth stating that Pamela Etter was being assaulted at that moment also were received, and cruisers were sent to the scene. The officers who arrived after the last call found that Etter had been abducted by Clinton Thurston and driven away in his 1971 Mercury.

The car was first spotted by Officer Erich Risch, who was wearing a red windbreaker over his uniform and driving an unmarked car that had flashing headlights, a portable blue light, and a siren, all activated. When Thurston's car stopped at an intersection, Risch walked up to the driver's window and identified himself as a police officer, but Thurston drove off.

Risch gave chase, other police cruisers joined in, and Officers Frank Daigneau and John Troy set up a roadblock at a point ahead of the chase. As Thurston passed by the barrier at about twenty-five miles per hour, both officers brandished guns and Troy fired at the car. A nick was found later in the left rear wheel. Appellant claimed that Thurston had accelerated toward Daigneau, narrowly missing Troy. After this episode, a police officer reported to the dispatcher that Thurston "had attempted to run over a police officer." The dispatcher then broadcast: "This is not only a violation of a restraining order, it's assault by means of a vehicle." According to the rules and regulations of the City's police department, the use of firearms is allowed to effect an arrest when certain circumstances exist, including an officer's reasonable belief that the crime in question includes the use or threatened use of deadly force. Lieutenant Thomas Rondeau testified that a car is considered a deadly weapon.

Thurston turned left at the first roadblock, and encountered a second one a block away. Officer Kenneth Schaub had placed his vehicle across the right hand lane while he stood in the middle of the three lanes and attempted to flag down Thurston's vehicle. Thurston again failed to stop, and the City claims that he swerved toward Schaub and that Schaub

---

**1.** Appellee originally named ten Springfield police officers in her civil rights claim and also asserted pendent state claims for conscious suffering and wrongful death. At trial, she voluntarily dismissed claims against all but the City and four officers. Also at trial, the court directed verdicts in favor of the City and three officers on the conscious suffering and wrongful death claims as well as on counts for conspiracy under 42 U.S.C. § 1985. The jury found for the fourth police officer on a wrongful death claim.

**2.** The district court initially ordered new trials for the City and the police officer on the ground of inconsistent verdicts. The court pointed to the discrepancy in the amounts of compensatory damages awarded against the City and the officer, and it also questioned an assessment of punitive damages against the officer in light of a finding of non-liability on a wrongful death theory, since both required "willfulness". Upon reconsideration, requested by appellee, the court withdrew its new trial orders. In its reconsideration motion, appellee had argued that the defendants had failed to request a new trial and that the district court had no discretion to order a new trial in the circumstances of this case. Although the police officer who was found liable filed an appeal, he has since withdrawn it.

had to dive to avoid being hit. Schaub then fired at the car. Schaub testified that a moment earlier, as Thurston headed toward the roadblock, Schaub drew his gun and would have shot to kill if he had been able to get a clear shot.

Officer Theodore Perry, who was on a motorcycle and had not heard instructions from headquarters that motorcycles should try to stay out of the pursuit, accelerated past several cruisers at this point, and engaged in a cat and mouse exchange with Thurston. Three times, the officer moved up even with the rear window on the driver's side of Thurston's car, and each time Thurston swerved toward the left. Perry fired at Thurston after the second and third swerves, apparently hitting him with the second shot. The vehicle slowed down and came to a stop. Perry's first shot apparently hit a house near where Thurston's car coasted to a stop.

As Risch ran to Thurston's car, he ordered him to get out. Risch testified that when Thurston failed to do so, Risch leaned in through the driver's window and struck Thurston on the head with his flashlight, and then he and several other officers dragged the apparently unconscious Thurston from the car.[3] They threw him to the ground, and, as he lay face down, they handcuffed him. Perry did not report to the street supervisor that he had shot at Thurston, and the officer who transported Thurston to the hospital was not told that any shots had been fired or that Thurston may have been shot. It was not until someone from the hospital called the police station to report that Thurston was in serious condition that street supervisor Rondeau suggested that doctors check for a bullet wound. Doctors then took x-rays and detected the bullet which had entered Thurston's brain. He died a short time later.

**3.** At about this time, Thurston's car lurched forward, hitting a cruiser that had stopped in front of it. A citizen witness testified that Thurston's car hit the cruiser before Thurston's car came to a complete stop, when it was traveling at about three to five miles per hour. Officer Perry testified that Thurston's vehicle had stopped and then began to move again as Thurston was being pulled from the car, possibly as his foot came off the brake. Pamela Etter testified that Thurston brought his car to a complete stop and that he hit the cruiser as he started to go again.

2. *Discussion*

a. *Judgment NOV and Directed Verdict*

It is by now axiomatic that § 1983 liability may not be imposed upon a municipality simply on the basis of *respondeat superior,* but it must instead be premised on a finding that the "injuries [were] inflicted pursuant to government 'policy or custom'", *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791 (1985); *Monell v. Department of Social Services,* 436 U.S. 658, 694 and n. 58, 98 S.Ct. 2018, 2031 and n. 58, 56 L.Ed.2d 611 (1978); *Voutour v. Vitale,* 761 F.2d 812, 819–20 (1st Cir.1985). Appellee argued primarily that the City should be found liable here because it had a policy or custom of inadequately training its police officers. A number of cases, including this court's recent *Voutour v. Vitale,* have accepted "inadequate training" as an actionable municipal policy or custom. *Marchese v. Lucas,* 758 F.2d 181, 188–89 (6th Cir. 1985); *Wellington v. Daniels,* 717 F.2d 932, 936 (4th Cir.1983); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981); *Owens v. Haas,* 601 F.2d 1242, 1246–47 (2nd Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). Under this theory, the city is liable either for failing to implement a training program for its officers or for implementing a program that was grossly inadequate to prevent the type of harm suffered by the plaintiff. *Voutour v. Vitale,* 761 F.2d at 820 ("supervisor must demonstrate at least gross negligence amounting to deliberate indifference, and ... this conduct must be causally linked to the subordinate's violation of plaintiff's civil rights"); *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982); *Wellington v. Daniels,* 717 F.2d at 936 (4th Cir.1983); *see Languirand v. Hayden,* 717 F.2d 220, 227–28 (5th Cir.1983).

Although we review the evidence in more detail later, we summarize it briefly here, as background for our inquiry into the Supreme Court's latest holding as to the required showing of a policy of inadequate training. Here, in an admittedly close case, the evidence consisted principally of: (1) testimony that there was but little guidance for undertaking an automobile chase; (2) testimony, contrary to that of the officers, that Thurston was not posing a life-threatening hazard to them; (3) a department rule on the use of firearms which in part required preliminary resort to less severe alternatives, arguably ignored by the officers; (4) another part of the rule which proscribed firing where there was substantial danger to innocent people, arguably violated by two officers; (5) a dispatcher's arguably overzealous announcement on police radio; and (6) evidence of looseness in investigating shootings.

■ Four members of the Supreme Court recently have raised doubts as to whether a harm allegedly caused by a policy of gross negligence in police training could meet § 1983's standard of causation. *Tuttle*, 105 S.Ct. at 2436 n. 7. We, however, continue to believe this is a viable theory of municipal liability because we conclude that it is possible to show "an affirmative link", *Tuttle*, 105 S.Ct. at 2436, between a policy of inadequate training and resort to harmful police methods. We base our conclusion on the belief that properly trained officers would avoid certain techniques as inappropriate for some circumstances. In *Voutour*, we referred to the affidavit of a putative expert witness in police training and procedure who stated that the shooting in that case was a highly predictable result of the inadequate training received by the town's police officers. 761 F.2d at 821–22. Even without expert testimony, we believe a plaintiff could show by a preponderance of the evidence that, for example, the failure to train police officers in how to conduct high speed chases caused the death of an innocent pedestrian struck either by a police cruiser or the suspect's car.

We thus come to the more specific issue of whether inadequate training was a viable theory in this case. Appellant would have us find that Clinton Thurston was killed as the result of a single incident of police action which, under *Tuttle*, 105 S.Ct. 2427, is insufficient, as a matter of law, to establish a municipal policy or custom. In *Tuttle*, a police officer who had been on the Oklahoma City force for ten months had responded alone to an all points bulletin indicating a robbery in progress at a bar. The officer testified that Tuttle walked toward him as the officer entered the bar, that the officer grabbed Tuttle's arm to restrain Tuttle from leaving, and that Tuttle eventually broke free and went outside, ignoring the officer's commands to "halt". When the officer stepped through the doorway, the officer saw Tuttle crouched on the sidewalk, with his hands in or near his boot. The officer again ordered Tuttle to halt, but when Tuttle started to come out of the crouch, the officer fired his weapon. The officer testified at trial that he believed Tuttle had removed a gun from his boot, and that the officer's life was in danger.

In reversing a $1.5 million judgment against the city, the Court focused on an instruction given by the district court which allowed the jury to " 'infer' " from " 'a single unusually excessive use of force ... that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge", *Tuttle*, 105 S.Ct. at 2435. Justice Rehnquist, writing for a plurality of four, stated that this inference "allows a § 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policymaker". *Id.* at 2435. He continued:

"Presumably, here the jury could draw the stated inference even in the face of uncontradicted evidence that the municipality scrutinized each police applicant and met the highest training standards imaginable. To impose liability under those circumstances would be to impose

it simply because the municipality hired one 'bad apple' ". *Id.*

The plurality further observed that it did not matter in *Tuttle* that respondent introduced independent evidence of inadequate training because "[t]here is nothing elsewhere in this charge that would detract from the jury's perception that it could impose liability based solely on this single incident", *id.*

*Tuttle* thus holds that a "single incident" of police misconduct does not, standing alone, permit an inference of a policy of inadequate training. That proposition does not, as a matter of law, dispose of this case. There was no instruction here equivalent to the one in *Tuttle* allowing a jury to infer a policy *solely* from the occurrence of the harm. The district court here told the jury that "[a]n incident of excessive force on the part of the police officers standing by itself, is insufficient to find the City of Springfield liable under Section 1983". Additionally, appellee presented evidence not only as to what occurred during the pursuit of Thurston but also as to the training of the City's police officers and the department's rules and regulations. *Tuttle* does not prevent a jury from drawing inferences from the police officers' alleged misconduct, but simply requires that those inferences be based on more than just the fact that the plaintiff was hurt at the hands of a police officer. In this case, the jury was presented with evidence of inadequate training, and was not told that it could find municipal liability "even in the face of uncontradicted evidence that the municipality" adhered to "the highest training standards imaginable", 105 S.Ct. at 2435. *See Rymer v. Davis*, 775 F.2d 756, 757 (6th Cir.1985).

Moreover, we think a second basis of distinction arises out of the facts of the cases. *Tuttle* involved only one officer who fired one shot. *See also Languirand v. Hayden*, 717 F.2d 220 (5th Cir.1983) (shooting incident involving one police officer). In contrast, this case involves at least ten officers and three separate shooting incidents, in which three different officers fired their weapons. We thus believe that this is not the sort of "single incident" that the Supreme Court addressed in its opinion in *Tuttle*, and we find support for this reading in both Justice Rehnquist's plurality opinion, 105 S.Ct. at 2435 ("one bad apple' "), and in Justice Brennan's concurring opinion:

"A single police officer may grossly, outrageously, and recklessly misbehave in the course of a single incident. Such misbehavior may in a given case be fairly attributable to various municipal policies or customs, either those that authorized the police officer so to act or those that did not authorize but nonetheless were the 'moving force,' *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), or cause of the violation. In such a case, the city would be at fault for the constitutional violation. Yet it is equally likely that the misbehavior was attributable to numerous other factors for which the city may not be responsible; the police officer's own unbalanced mental state is the most obvious example.... To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." 105 S.Ct. at 2440.

The significance of the factual differences between these cases lies in the inferences a jury may properly draw simply from the incident itself. Justice Rehnquist observed in *Tuttle* that where the municipal policy relied upon for liability is not itself unconstitutional, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation", 105 S.Ct. at 2436 (footnotes omitted). We believe proof of the sort of incident we have before us contributes toward proof of the fault and causation elements of the city's liability to a much greater extent than does proof of the sort of single inci-

dent involved in *Tuttle*. This is so because the widespread activity here is more likely to reflect the operating procedures of the police department than would a single incident such as occurred in *Tuttle*. Although we doubt that even circumstances such as those here would justify an instruction such as that given in *Tuttle*, we need not decide that issue. For purposes of this case, we only find that *Tuttle*'s "single incident" holding does not preclude municipal liability, as a matter of law, simply because the police officers' actions occurred within a "single" evening.[4] The Fifth Circuit reached a similar conclusion in the post-*Tuttle* decision of *Grandstaff v. City of Borger*, 767 F.2d 161 (1985). *Grandstaff* involved the shooting death of an innocent bystander during the pursuit of a fleeing suspect. In its opinion, the Fifth Circuit noted the absence of direct testimony of prior misconduct within the Borger police force and "that isolated instances of police misbehavior are inadequate to prove the knowledge and acquiescence by a city policymaker in that manner of conduct", 767 F.2d at 171. The court went on to point out, however, that "[t]he evidence does prove repeated acts of abuse on this night, by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom". *Id.* The court observed that all six officers of the department's night shift were involved in the incident. In upholding the

jury verdict for the plaintiff, the court emphasized that the police chief's failure to make changes in practice in the aftermath of this incident allowed an inference that the officers' actions were "the way things are done and have been done in the City of Borger", *id.*, and thus reflected city policy. Like *Grandstaff*, the instant case involved many officers and a series of exchanges between police officers and civilians. This was a case, unlike *Tuttle*, arguably involving more than "one bad apple".

Our conclusion that *Tuttle* does not bar this suit does not end the inquiry into whether the district court erred in rejecting the City's motions for directed verdict and judgment notwithstanding the verdict. We must next look at whether, with the evidence before it, the jury could not properly find that the City was grossly negligent in its training of police officers and that that negligence was the proximate cause of Thurston's death. *Voutour v. Vitale*, 761 F.2d at 820.

As we begin our analysis, we have uppermost in mind the strictures of both law and sense that dictate a deference to the facts and inferences therefrom as they could have been found by the jury. In reviewing denials of the motions for directed verdict and judgment notwithstanding the verdict, we may reverse the district court only upon a finding that the evidence could lead reasonable persons to the sole conclusion that the City was not liable. *Wildman v. Lerner Stores*, 771 F.2d 605, 607 (1st Cir.1985).

---

**4.** It can not be that an incident that is single only in that it begins and ends within a confined period of time can never give rise to a finding of municipal liability. We agree with the court in *Leite v. City of Providence*, 463 F.Supp. 585, 590 (D.R.I.1978), that a "city's citizens do not have to endure a 'pattern' of past police misconduct before they can sue the city under section 1983". That court went on to note the circumstances in which liability properly could attach in the absence of such a pattern:

"If a municipality completely fails to train its police force, or trains its officers in a reckless or grossly negligent manner so that future police misconduct is almost inevitable, the municipality exhibits a 'deliberate indifference' to the resulting violations of a citizen's constitutional rights. In such a case, the municipality may fairly be termed as acquiescing

in and implicitly authorizing such violations.... The training and supervising of these police officers must be so inadequate and the resulting misconduct so probable, that the city can fairly be considered to have acquiesced in the probability of serious police misconduct." *Id.* at 590–91.

*See also City of Oklahoma City v. Tuttle*, 105 S.Ct. 2427, 2441 (Brennan, J., concurring) ("A § 1983 cause of action is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims; by exposing a municipal defendant to liability on the occurrence of the first incident, it is hoped that future incidents will not occur.").

We must review the evidence in the light most favorable to appellee. *Fishman v. Clancy,* 763 F.2d at 485, 486 (1st Cir.1985). These principles are particularly pertinent in a case like this, compared to, say, a simple personal injury case where, traditionally, a plaintiff tends to excite sympathy. For in this case, as our narration of facts reveals, the conduct and character of decedent are anything but evocative of sympathy. Accordingly, if a soundly instructed jury, which would in all likelihood view the conduct of decedent to be as reprehensible as do we, nevertheless found the defendants liable, we do not lightly contemplate reversal.

██ We are unable to say that no jury could find that the City was grossly negligent in failing to train its officers, causing their use of excessive force against Clinton Thurston.[5] Although evidence on the Springfield Police Department's training practices was sparse, the testimony of two officers indicated that the department gave officers virtually no guidance in apprehending suspects fleeing in motor vehicles who ignored orders to stop. Schaub testified that he was told not to set up physical roadblocks but that he should use his lights and siren, stand in the street, and put up his hand in a stopping motion. Troy testified that his training on stopping a car consisted of being told to move up behind it, put on his lights and siren, and hope the suspect pulls over. The jury could have found that partial roadblocks were not an effective method of slowing down a suspect who was unwilling to stop, and that some technique short of shooting the driver should have been used. The jury might have believed that deploying several police cars to crowd or surround Thurston's car might have forced him to show down, or that sheer persistence eventually might

have worn Thurston down, or that calling in reinforcements might have intimidated him into compliance. The jury also could have believed the testimony that Thurston repeatedly shouted to the officers that he was going only to his sister's house, which, in fact, was located a short distance from where the pursuit ended. If the jury believed the officers heard Thurston and knew he might stop voluntarily, the decisions to shoot, particularly the decisions to shoot to kill, reasonably could be viewed as the direct result of training that was grossly inadequate.

The jurors could have believed that the actions of two officers, in particular, evidenced a failure to consider methods of stopping a fleeing suspect less drastic than shooting him. Presumably Perry could have shot out the rear tire of the car from his positions right behind and next to Thurston's vehicle, forcing the car to slow down so that the officers could surround it. Schaub, too, was eager to shoot to kill. Although he fired only after Thurston ran through the second roadblock, allegedly forcing Schaub to jump out of the way, Schaub testified that he would have shot to kill sooner if he could have gotten a clear shot. Moreover, the jury could have believed Etter's testimony that Thurston did not try to run down any officers, which would make their shootings appear even more precipitous.

The fact that proper police procedures should include less severe means of stopping a fleeing suspect is underscored by the Springfield Police Department's own Rule 28. Section 12 of that rule, which governs the use of firearms, states that "[a] department member shall not discharge a firearm in the performance of duty, except under [certain specified] cir-

---

**5.** The City does not challenge the jury's conclusion that Clinton Thurston's constitutional rights were violated. It argues only that it is improper to impose liability on the City for the violation.

The City also does not challenge the jury's implicit finding that decisions regarding the type of training received by Springfield's police officers are a matter of policy attributable to the

City, and we therefore do not address the issue of when an official's actions properly may be designated as "municipal policy". *See Voutour v. Vitale,* 761 F.2d 812, 823 (1st Cir.1985); *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir.1984). *See also Pembaur v. City of Cincinnati,* 746 F.2d 337, 341 (4th Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 3475, 87 L.Ed.2d 611 (1985).

cumstances, *and then only after all other reasonable alternatives have been exhausted and where there is no substantial danger to the public*". (Emphasis added.) If the department recognized the importance of pursuing alternatives to deadly force, as this rule indicates, and yet failed to train on any alternative methods of stopping the suspect in a high-speed pursuit, a jury properly could draw the inference that the department made a conscious policy decision not to do such training. And since the jury may have believed that use of alternatives such as those we have described would have prevented the shooting of Thurston, this rule provides additional support for jury conclusions that (1) the City was grossly negligent in failing to train its officers on ways to capture a fleeing suspect without killing him, and that (2) an "affirmative link" existed between the failure to train and Thurston's death.

The jury also could have drawn an inference of inadequate training from the failure of two police officers to abide by the department rule prohibiting the discharge of firearms to effect an arrest when innocent persons are at risk. Although the evidence showed that the officers knew of the rule, their actions permitted an inference that no shooting would have taken place had the officers been properly trained on how to apply it to actual situations. Schaub apparently aimed either at Thurston or generally at his car, not at the tires, and a jury reasonably could believe that Schaub's firing created a risk to Etter. Perry's decision to shoot to kill the driver in a high speed chase unquestionably put the life of the passenger, Etter, in jeopardy. Although there was conflicting testimony as to whether Etter was sitting up in the front seat, or slumped down, the jury could have found that she was visible and that at least some of the officers knew there was a passenger because the pursuit began with an alleged abduction, a fact which had been transmitted over police radio.[6] In addition, one bullet, perhaps Perry's first one, landed in the door between the garage and breezeway of a private home located near where Thurston's car stopped, suggesting an additional risk to other innocent people. Rondeau testified that Perry's shots were fired in a thickly settled area.

Finally, although appellee emphasized the policy of inadequate training as the basis for municipal liability, she also pointed to evidence of other policies which the jury may have considered in reaching its verdicts. The jury could have believed that this department's policy was to use deadly force whenever it technically was permitted by the rules, even though something less would have sufficed. *See Tennessee v. Garner*, —— U.S. ——, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985) ("if ... there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used *if necessary to prevent escape*" (emphasis added). The dispatcher's announcement that Thurston's alleged attempt to run down a police officer means "this is assault by means of a vehicle", a deadly weapon, could be viewed as an indirect authorization for the use of deadly force, causing the officers to shoot precipitously. Captain Daniel Spellacy testified that he was monitoring the pursuit with the dispatcher, and

---

**6.** Perry testified that he shot at Thurston in part to stop the fleeing suspect and in part to protect himself because Thurston was trying to knock him off his motorcycle. The latter reason was unjustified since department rules say a chase is to be aborted if there is danger to officers, and Perry unquestionably could have avoided the danger. In fact, Captain Spellacy had ordered motorcycles out of this pursuit because of possible danger to cycle officers, but Perry testified that he had not heard this order. It would seem that Perry would be justified in continuing the pursuit once he perceived he was in danger only because he felt that Etter's life was in jeopardy. He testified, however, that he did not know there was a passenger in the car. Thus, the jury could have found his continuing involvement, which resulted in the decision to shoot, to be further evidence of inadequate training on conducting pursuits. Even if the jury disbelieved him and concluded that he knew Etter was in the car, it could have found a significant lapse in training in his decision to shoot the driver of the car in which she was a passenger.

so the jury could have found that the man in charge of the department that night approved the escalating intensity of the pursuit.

■ Appellee also argued that the police department's apparently sloppy post-shooting investigative procedures increased the likelihood of officers shooting without justification. Her theory is that neglect in investigating shootings means that there will be a low level of accountability following the use of firearms. The result, in effect, is a policy of encouraging precipitous shooting. As evidence of sloppiness, appellee points out that the department had no policy on preserving all evidence from a shooting and that two officers, in fact, disposed of spent cartridges, making it more difficult to investigate the shootings. The jury also could have believed that Perry never told street supervisor Rondeau at the scene that he had fired his weapon at Thurston, a neglect which Rondeau testified hampered his ability to investigate.

On their own, these other policies were not proven sufficiently or linked sufficiently with the harm to impose municipal liability.[7] The inferences to be made from these other facts merely lend weight to what we view as the policy a jury reasonably could find as the "moving force", *Polk Co. v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), behind the actions which led to Thurston's death, the policy of inadequate training. Thus, we hold that a jury reasonably could have found that it was the department's gross negligence in training that caused the premature use of deadly force against Thurston.[8]

### b. *Jury Instruction*

Appellant claims that the jury charge was inadequate because it failed to indicate that liability against the City could not be predicated on an isolated incident of negligent training, but must instead be based on "a pattern of deliberate supervisory inaction and indifference". The City also contends that the trial court failed to make clear the issue of proximate cause, specifically that an "affirmative link" must be established between the municipal policy and the unconstitutional activity of its employees. Finally, the City argues that it was entitled to an instruction that liability may result only "from the failure of supervisory officials to remedy a *specific* situation, of which they knew or should have known in the exercise of reasonable diligence, the continuation of which causes a deprivation of constitutional rights".

The trial court charged the jury as follows on the claim against the City:

"The City of Springfield is the employer of police officers, but the City cannot be held liable merely because the police officers involved are its employees. An incident of excessive force on the part of the police officers standing by itself, is insufficient to find the City of Springfield liable under Section 1983. A governmental body can be found responsible for the deprivation of a person's civil

---

**7.** We agree with appellant that the district court's stated reason for denying the motion for judgment notwithstanding the verdict also reflects an insufficient basis for imposing municipal liability. The court suggested that the City had ratified defendant Perry's action by clearing him and finding that he had acted in accordance with the police department's policies. We are unconvinced that a failure to discipline Perry or other officers amounts to the sort of ratification from which a jury properly could infer municipal policy. *Cf. Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985). We need not agree with the district court's reasoning to affirm its judgment, however. *Chevron U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 2781 nn. 7–8, 81 L.Ed.2d 694 (1984); *Riley Co. v. Commissioner*, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); *Casagrande v. Agoritsas*, 748 F.2d 47, 48 n. 1 (1st Cir.1984).

**8.** Appellee argues that the jury verdict also is supportable on the basis of an Eighth Amendment claim of deliberate indifference to Thurston's medical needs after he was shot. Although the complaint alleges that Thurston was denied adequate medical care, this theory was not presented to the jury and appellee failed to provide any evidence suggesting that Thurston's treatment after the shooting aggravated the harm from the shooting itself. We therefore reject this claim.

rights if the actions taken by its employees, are in accordance with a custom or practice of the government and those actions caused the deprivation of the person's rights.

"The custom or practice may be an official policy of the City; however, the custom or practice does not have to be authorized by written law, nor must it be the result of· formal approval through official decision-making channels. It is enough that the customs or practices are so permanent·and well-established, as to demonstrate implicit authorization or approval or acquiescence in the unconstitutional conduct. Where a city's failure to train, supervise, or discipline police officers is reckless or grossly negligent, and this failure constitutes a custom or practice of the city, then the city may be held liable under Section 1983.

"If you are convinced by a preponderance of the evidence that Clinton Thurston was deprived of his civil rights by the actions taken by the defendant police officers then you must decide if the actions taken were done in accordance with the custom or practice of the City of Springfield.

"If you are convinced by a preponderance of the evidence that the officers acted in conformity with the City's custom or practice, and that this custom or practice violated Clinton Thurston's civil rights, then you may find for the plaintiff and her claim against the City of Springfield. Obviously the reverse is true if you find this is not so, then you will find for the City in this claim."

Earlier in its charge, the district court explained the three elements necessary for proof of plaintiff's claim under Section 1983: that the defendants' conduct violated Thurston's federal constitutional right not to be deprived of life without due process of law; that the defendants acted under color of law; and that the defendants' acts were the proximate or legal cause of Thurston's damages. The court defined proximate cause as follows:

"An injury or damage is proximately caused by an act or failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission."

■ We agree that these jury instructions could have been more detailed. The court could have used the Supreme Court's language to explain the need for an "affirmative link" between the City's policy and the harm. It could have emphasized the distinction between negligence and reckless or grossly negligent conduct. But while the district court's instructions could have been better, they were not defective. The district court did not make the error of the trial court in *Tuttle*. Rather than allowing liability based solely on the incident in which Thurston was harmed, the court here charged that one incident standing by itself is insufficient to make the City liable under Section 1983. Its instructions included a charge on proximate cause, and it instructed the jury that it must find a failure to train which amounted to gross negligence.

■ A defendant is not entitled to any specific words of instruction, but only to instructions that properly convey the applicable law of the case. 9 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 2556 (1971); *see Cupp v. Naughton*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Dyer v. Ponte*, 749 F.2d 84, 88 n. 5 (1st Cir.1984); *United States v. Morris*, 700 F.2d 427, 433 (1st Cir.1983). We hold that the instructions in this case did so.

*Accordingly, the judgment of the district court is affirmed.*