**Bruce BARON, Plaintiff,**

v.

**Daniel HICKEY, Suffolk County Sheriff's Department, and Sheriff of Suffolk County, Defendants.**

**No. CIV.A.01–10143–PBS.**

United States District Court,
D. Massachusetts.

Nov. 5, 2003.

Kathleen M. Cawley, Suffolk County Sheriff's Department, Boston, MA, Douglas I. Louison, Stephen C. Pfaff, Merrick, Louison & Costello, Boston, MA, for Defendants.

Carolyn Conway, DiMento & Sullivan, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Bruce S. Baron, a corrections officer, brings this action pursuant to 42 U.S.C. § 1983 against his employer, the Suffolk County House of Correction ("the Department"), claiming he was forced to resign due to co-worker harassment in retaliation for his reporting a fellow officer's misconduct in violation of the institution's "code of silence."[1] Baron also brought suit against fellow corrections officer Daniel Hickey, who Baron claimed was the lead perpetrator of the harassment. After trial, a jury found that the Department violated Baron's civil rights by its custom and policy of failing to investigate and discipline employees who enforced the "code of silence" and awarded him $500,000 in damages. The jury also found that Hickey interfered with Baron's contractual relationship with the Department, but that Baron's harassment claims were time-barred, and the jury awarded no damages against Hickey for that interference.

---

1. This Court denied defendant's motion for summary judgment. *See Baron v. Hickey,* 242 F.Supp.2d 66 (D.Mass.2003).

At the close of plaintiff's case, and again at the close of evidence, the defendants moved for judgment as a matter of law under Fed.R.Civ.P. 50(a), which the Court denied. Defendant Department now renews its motion for judgment as a matter of law under Fed.R.Civ.P. 50(b), contending that there were insufficient facts demonstrated at trial to support the jury's verdict. In the alternative, defendant seeks a new trial pursuant to Fed.R.Civ.P. 59. Defendant also seeks a remittitur of the damages award, or, in the alternative, a new trial on damages. After briefing, and for the reasons stated below, the motions are **DENIED**.

## II. STANDARD OF REVIEW

In evaluating a motion for judgment as a matter of law, the trial court must scrutinize the evidence in the light most hospitable to the non-moving party. *Rolon–Alvarado v. Municipality of San Juan*, 1 F.3d 74, 76–77 (1st Cir.1993). In exercising that scrutiny, "the court must 'not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.' " *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987). "A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994), *citing Rolon–Alvarado*, 1 F.3d at 77. Put differently, "judgment n.o.v. should be granted only when the evidence could lead reasonable men to but one conclusion." *Bordanaro v. McLeod*, 871 F.2d 1151, 1154 (1st Cir.1989) (citation omitted).

## III. EVIDENCE AT TRIAL

When the evidence is viewed in the light most favorable to Baron, the jury could have found the following facts:

### 1. *Card-playing Incident*

Bruce Baron had been working in the deli business until his wife was diagnosed with multiple sclerosis. With a sick wife and two small children, he decided he needed a job with security, health benefits and a retirement plan. On December 7, 1995, after getting help from the Massachusetts Senate president, he reported to work at the Suffolk County House of Correction as a corrections officer.

The job went smoothly until January 27, 1997, when on a hallway monitor Baron observed a colleague, Sgt. Curtis, playing cards with inmates, a violation of Department policy. Baron's supervisor, Sgt. Walsh, also observed the card playing. Walsh was incensed and he badgered Baron to call Richard Feeney, a Superintendent. Baron reluctantly called Feeney, who upon seeing the card-playing on the monitor exclaimed "stupid bastard" and proceeded to go with Walsh to confront Curtis. Another sergeant then turned to Baron and said, "Do you know what you did?" Baron protested that it was not his fault, that Walsh had forced him to make the call about Curtis and that he, Baron, hadn't even written a report. As a result of the incident, Sgt. Curtis received a three-day suspension.

At roll call the next morning, the other officers parted ways when Baron approached. One muttered "rat." For the next several months between January and March, 1997, Baron was regularly met with the epithet "rat" by his co-workers. He suffered harassing phone calls, was ostracized in the cafeteria, and was subjected to 8 ½ × 11 inch posters calling him a rat and other disparaging terms. [*See* Ex. 4]. One depicted Baron stating that he would watch "child porno tapes." They were hung up around the Department. Baron did not complain to anyone in early

1997, hoping the harassment would dissipate.

## 2. *Rodent Razzing*

His hope that the harassment would soon stop turned out to be illusory. In June 1997, just after lunch, Baron encountered defendant Hickey, at six-feet and two-inches tall, and with a large build, on a walkway outside the cafeteria. Hickey yelled at the inmates to give Baron their cheese sandwiches. Baron yelled to Hickey: "What's the problem?" Hickey again addressed the inmates: "Give the fucking rat the cheese sandwiches." Baron went to the Sheriff's Investigative Division ("SID"), which was responsible for dealing with internal complaints, and reported the incident to SID Officer Neville Arthur. Arthur told Baron to write down what happened and said that he would investigate the matter.

By the summer of 1997 Baron had taken to eating lunch by himself because he was afraid he would suffer harassment if he ate among the other officers. On one occasion, he did go to the cafeteria accompanied by two officers—Holtzclaw and President—who assured Baron "you'll be safe with us." Baron was sitting between Holtzclaw and President in the cafeteria when Hickey approached Baron and slammed a handful of cheese on Baron's plate. Hickey said: "What are you going to do about it, rat?" Baron was scared and left the cafeteria. He sent a written report of the incident to SID.

Following this cafeteria incident Hickey repeatedly warned Baron, when the two crossed-paths in the Department, that he would "beat the shit out of" him. One afternoon in June, Baron was working in the "tower" at the jail and found himself with Hickey at the elevator. Hickey poked Baron in the chest, saying, "You don't scare me, zero" and he further called Baron "a fucking Jew coward." Others

too, in particular Officer Mason, threatened Baron with physical harm. Also that summer, Baron, after completing an afternoon shift at the jail, found fecal matter and spit smeared on his truck and his tires slashed. Baron went directly to Captain O'Brien, a supervising officer, and reported the vandalism.

Another cafeteria incident occurred in July 1997. Baron was sitting at a table by himself when Hickey approached him with seven other officers and said: "Do we smell a rat in here, boys?" Then Hickey turned his attention to Baron's wife: "How's Mrs. Rat doing?" To this Baron retorted that Hickey should go "fuck himself" or "kill himself." Hickey replied, "Maybe the rat has a backbone."

In June or July of 1997, Baron started receiving threatening phone calls at his work station. In one such call a muffled male voice said he would make Baron a cripple so there would be two cripples in his house (by this time Baron's wife was confined to a wheelchair as a result of the multiple sclerosis). On one occasion when Baron received a threatening call, possibly from a fellow corrections officer, Officer Robert O'Brien listened in and said to the caller: "You clowns leave this man alone. He has a sick wife at home." O'Brien told the suspected officer, "If it was him to cease the immature action." (Ex. 23). Threatening calls were also received at Baron's home by his wife. Baron went again to SID to complain about the phone calls.

Another incident occurred on September 13, 1997. Lieutenant Robert Pizzi heard an altercation between Baron and Hickey. Hickey said, "Do I hear a rat?" Baron replied: "Why don't you go outside and commit suicide?" Pizzi admonished Hickey to leave Baron alone, and reported the incident to Neville Arthur. Lieutenant Pizzi then called Baron out of the cafeteria

and admonished him. But Hickey returned to the cafeteria and said to Baron: "You think I'm afraid of the fucking lieutenant?" Baron again went to SID and reported the incident to either Neville Arthur or Mike Jacobs.

### 3. *The Investigation*

This report from an officer prompted an inquiry by SID into the alleged harassment. Hickey gave a statement on October 1, 1997, admitting that he made the statement, explaining

On September 13th 1997, I was assigned to SERT–4 with C.O. C. Carter. At approximately 11:00 a.m., I, Deputy Hickey, was standing outside building # 3 by the stairwell leading to units 3–2 and 3–4. At that time, C.O. Bruce Baron walked down the stairs and proceeded towards the staff dining hall. As he passed me by the foot of the stairs, I looked at him. C.O. Baron looked at me and stated *quote:* 'You don't talk to me. You're a punk like all of the others.' C.O. Baron continued towards the staff dining hall. Approximately 5 minutes later, I entered the staff dining hall. C.O. Baron was sitting alone at a table by the windows, eating. As we made eye contact, Baron again stated quote: "Punk." I replied quote: "Did I hear a squeak?" Baron stated quote: "Hey Hickey ... do us all a favor and go kill yourself." I again replied quote: "Did I hear a squeak?" Lt. Robert Pizzi apparently overheard these statements.

At that point, Lt. Pizzi asked to speak to me privately. Lt. Pizzi and I proceeded to the office in the kitchen. Lt. Pizzi stated the statements were inappropriate and asked me why it occurred. I agreed with Lt. Pizzi and informed him of the statement previous to my arrival in the staff dining hall and the statements made upon my arrival in the staff dining hall. Lt. Pizzi recommended I should keep comments to a professional

level when speaking with Baron. I agreed. There was no further incident concerning C.O. Baron and myself.

Please note: This is the only incident involving C.O. Baron and myself; that was not maintained at a professional level. All other occasions where C.O. Baron and I were in the same proximity, were uneventful. The other allegations *did not* occur. Specifically, an allegation was made that I threw cheese at him. This was not true.

(Ex. 18). Hickey was never sanctioned for his conduct.

When Baron went to SID, he usually made a written complaint to Neville Arthur, the senior investigator, or Mike Jacobs, either in a formal written report or an oral report the substance of which was noted on a legal pad kept for such purposes by SID. Baron went to SID at least 30 times to complain of harassment. SID, however, produced only two written complaints from Baron, both concerning the cafeteria cheese-slamming incident. SID never prepared a written report about the altercation between Hickey and Baron or any of the alleged harassment by phone calls or posters. Arthur orally discussed the complaints with his supervisor, although the policy was to prepare a written report.

### 4. *Night Shift*

In October of 1997, in an effort to evade further harassment, Baron voluntarily started working the night shift at the jail. But moving to the night shift did not end the harassment. The overlap between shifts at the jail was such that Baron would often run into Hickey in a "salley port" security passage when Baron was arriving and Hickey was leaving. Hickey and other officers continued to harass and taunt Baron in such encounters, including calling him a child molester. Baron often

would leave his shift late in an effort to avoid these encounters. During his night shift duty Baron also continued to be subjected to harassment. While serving at a post by himself, for example, Baron was regularly refused bathroom breaks. Because of this, on occasion Baron had to relieve himself into a coffee cup at his work station. He was also refused supplies he needed to fulfill his responsibilities.

Baron continued to complain about harassment but received no response from SID. He wrote a letter to the jail Superintendent, to no avail. Finally, in January of 1998, he went to a Deputy Superintendent Lockhart and Officer Mike Powers, the union president, and told them he could no longer take the harassment. When he left the meeting Hickey was standing in the hallway and said to Baron words to the effect that now he was a molester of little girls as well as being a "rat fink." Deputy Superintendent Lockhart then spoke to Hickey and told him to stay away from Baron. No written report was prepared.

### 5. *Baron's Problems*

In approximately February 1998, Baron stopped making complaints about the harassment, believing that such efforts would continue to be fruitless. That same month he collapsed at work as a result of stress and was taken home. After he returned to work, the harassment continued again on a daily basis. Baron's health was deteriorating, and the stress of the harassment was causing him to suffer headaches and to have a short temper with his ill wife at home. In August of 1998 Baron resigned from the Sheriff's Department. Even after resigning he continued to suffer harassment. On the day he went to clear out his locker, Officer Mason refused

to let Baron into the facility, saying, "I'll kill you first." After contacting the Sheriff as well the union president, Baron finally collected his belongings and turned in his identification card. In January of 2001, Baron initiated this lawsuit.

Baron had other problems at work. He performed contracting work on off-duty hours and hired other officers to help.[2] Baron was not liked because of rumors that he had failed to pay money owed to another officer for work done outside the jail.

In 1997 and 1998, Baron had been disciplined by the Department for several infractions of his own. In December of 1997, Baron was suspended for five days without pay for bringing sandwiches and some mints to a female inmate in violation of Department policy. The inmate had told Baron she was allergic to tomatoes and could not eat the meal provided that day in the cafeteria. He was placed on a one-year probationary period which made him subject to termination for other violations. When he collapsed, Baron was under the stress of having received just six days earlier a notice that criminal charges of indecent assault and battery had been brought against him by a female inmate on January 28, 1998. Baron was ultimately acquitted of those charges by a jury in Roxbury District Court on February 16, 1999.

Then on June 29, 1998, Baron received information from an inmate, who was concerned that his under-aged girlfriend was being threatened with sexual assault by her neighbor. Baron reported this information directly to the Boston Police Department rather than to Baron's superiors, a violation of Department policy. He also faced sanctions from this infraction. He

---

**2.** Indeed, Baron testified he did contracting work for free for a superior officer who kept asking for more work.

was threatened with termination and then offered a ten-day suspension without pay. When Baron declined the settlement, he was suspended for 20 days without pay effective August 13, 1998. (Ex. 20). Rather than be suspended, he quit. While Baron testified about his emotional distress, he presented flimsy evidence concerning any economic damages.[3]

### 6. *Code of Silence*

Former Superintendent Feeney, now retired from the Department but acting as Superintendent in 1997, was the third or fourth person in charge under the Sheriff. He testified that there was a "code of silence" among the officers at the jail which resulted in a "lack of reporting [by officers] to protect each other." Feeney further said that Baron broke that "code of silence." Feeney confirmed that Baron had complained to him, and that he told Baron to write a report to SID. He said that posters were endemic in the institution and it was hard to prove who hung them. However, they were supposed to be removed immediately when found. Other witnesses disputed the existence of any "code of silence" or that Baron suffered any harassment for breaking it.

## IV. LEGAL DISCUSSION

### A. Custom

■ Plaintiff argues that the Department condoned a widespread, well-known "code of silence," including the peer-to-peer punishment of any corrections officers who violated it, by doing nothing to stop the enforcement of the code against Baron. He also argues that there was an affirmative link between this custom and Baron's constructive discharge. Defendant argues that Baron failed to introduce sufficient evidence that the defendant con-

doned the workplace harassment by failing to unearth the culprits. While not disputing that there was evidence of severe, pervasive and long-term harassment of Baron in the workplace, defendant emphasizes that most of it was anonymous, and it did what it could to investigate the perpetrators.

It is well understood that the government may not be held liable under § 1983 for the actions of its employees under a theory of *respondeat superior*. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The First Circuit has recognized two requirements for establishing municipal liability:

> First, the custom or practice must be attributable to the municipality. In other words, it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights.

*Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted). "Constructive knowledge 'may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them.'" *Id.* at 1157 (alterations in original) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir.), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988)). A municipal custom may be shown by "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges"

---

**3.** Perhaps because of this lack of evidence, the jury returned no verdict for monetary damages against Hickey although it found him liable for intentional interference with contractual relations.

of unconstitutional conduct by its employees. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991) (citing *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir.1986)).[4]

Because a finding of liability where there is evidence of only one incident of employee misconduct "would be the equivalent of imposing *respondeat superior* liability upon the municipality," the Supreme Court has concluded that "a 'single incident' of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983." *Bordanaro,* 871 F.2d at 1161 n. 8 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)) (involving a single shooting of one suspect by a police officer); *see also Vizbaras v. Prieber,* 761 F.2d 1013, 1017 (4th Cir.1985) (single incident of asphyxiation during arrest insufficient to show custom); *Camarano v. City of New York,* 624 F.Supp. 1144, 1146 (S.D.N.Y.1986) (single illegal arrest and confinement could not establish custom).

However, the "single incident" rule is not immutable. In *Kibbe v. City of Springfield,* the First Circuit held that the "single incident" rule would not preclude a § 1983 claim based on just one event involving several police officers who had shot at and killed a suspect during a car chase. 777 F.2d 801, 805–06 (1st Cir.1985), *cert. granted,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *cert. dismissed,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987). It reasoned:

> *Tuttle* involved only one officer who fired one shot. In contrast, this case involves at least ten officers and three separate shooting incidents, in which three different officers fired their weapons. We thus believe that this is not the sort of "single incident" that the Supreme Court addressed in *Tuttle* .... This is so because the widespread activity here is more likely to reflect the operating procedures of the police department than would a single incident such as occurred in *Tuttle.* Although we doubt that even circumstances such as those here would justify an instruction such as that given in *Tuttle* [permitting jury to draw inference of a municipal custom based solely on a "single incident"], we need not decide that issue. For purposes of this case, we only find that *Tuttle* 's "single incident" holding does not preclude municipal liability, as a matter of law, simply because the police officers' actions occurred within a "single" evening.

*Id.* at 805–06. *See also Grandstaff v. City of Borger,* 767 F.2d 161, 170–71 (5th Cir. 1985) ("The evidence does prove repeated acts of abuse on *this* night [in which police killed innocent victim mistaken for fleeing suspect], by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom.").

Other courts have held that serial misconduct directed at a single victim constitutes more than a "single incident" of misconduct, and can establish a municipal custom for the purpose of asserting § 1983 liability. *See Watson v. City of Kansas City,* 857 F.2d 690, 696 (10th Cir. 1988) (recognizing that "[t]he plaintiff's version of events regarding her own situation, if believed, may demonstrate a pattern of deliberate indifference on the part of the Police Department," but finding it unnecessary to decide whether such evidence alone would suffice to establish § 1983 liability); *Turpin v. Mailet,* 619

---

**4.** The defendant argues that there was no evidence with regard to who is a policymaker of the Sheriff's Department. However, there was evidence that the Superintendent and Deputy Superintendent set policy for the jail. This was not an issue pressed at trial.

F.2d 196, 201–02 (2d Cir.1980) (holding that allegations of repeated illegal arrests of the plaintiff could establish custom; and finding that "[u]nlike the 'first arrest' cases, which struggle with whether a single episode can suggest a policy, [plaintiff's] claims were sufficient to entitle him to a trial"); *Jeffes v. Barnes,* 208 F.3d 49, 63 (2d Cir.2000) (finding that the code of silence was a custom based on the "scope, duration, openness, and pervasiveness of the retaliation against officers who broke the code of silence"); *Thurman v. City of Torrington,* 595 F.Supp. 1521, 1530 (D.Conn.1984) (holding that ongoing pattern of deliberate indifference raises an inference of "custom" or "policy" on the part of the municipality) (citations omitted); *Lowers v. City of Streator,* 627 F.Supp. 244, 247 (N.D.Ill.1985) (where police were indifferent to complaints by rape victim who was subsequently raped again by the same perpetrator, complaint alleged a "sufficient pattern of activity over nearly a six-month period to indicate a deliberate indifference on the part of the defendant city. This pattern of behavior is sufficient to at least raise the inference of a policy on the part of the city.") (citations omitted); *Soto v. Carrasquillo,* 878 F.Supp. 324, 329 (D.P.R.1995) (recognizing viability of the serial misconduct theory where plaintiff alleged an ongoing pattern of police indifference) (citations and subsequent history omitted); *Gil v. Vogilano,* 131 F.Supp.2d 486, 492–93 (S.D.N.Y.2001) (allegations were sufficient to plead § 1983 custom case brought by prisoner who "alleged a series of acts and omissions by several state actors over a period of seven months by which he was denied access to doctors and treatment despite his repeated requests and assertedly obvious pain").

Under the serial misconduct cases, Baron's allegations suffice to support a claim of an ongoing pattern of deliberate indifference to Baron's complaints of harassment from which the jury could infer a custom of condoning the use of harassment to enforce the code of silence against "rats." Baron presented evidence that the high ranking officials were aware of the series of physically threatening and humiliating incidents, yet did little to stop it. His testimony was corroborated by Superintendent Feeney's acknowledging the existence of a code of silence at the jail.

Plaintiff presented evidence of a head-in-the-sand attitude by SID.[5] According to the evidence, the jury could reasonably have found that SID made only a perfunctory inquiry, failed to write a report or even keep a file, and declined to impose any sanctions or take any proactive steps to stop the harassment. The jury could have believed that Baron made dozens or even scores of oral complaints, as well as eight written complaints, most of which was in essence ignored or lost by supervising officers in SID. Further, Neville Arthur, the SID officer with whom Baron filed most of his complaints, testified that he had no knowledge of derogatory "posters" ever being hung around the Department. This testimony, in light of the three such posters received in evidence and other supervisors' unabashed acknowledgment that such posters were a regular feature of the workplace within the Department, may reasonably have lent sup-

---

**5.** The Stern Commission Report named after former United States Attorney Donald Stern, concluded that there was a "code of silence" and deficiencies at SID in investigating complaints because of poor training and staffing. However, the Court excluded that report under Fed.R.Evid. 803(8)(C) and plaintiff failed to introduce any witnesses (experts or commission members) who could provide an adequate foundation for its admission despite ample opportunity to do so, and the Court does not consider it in the sufficiency analysis.

port to the finding that there was an unofficial custom at the Department of turning a blind eye to workplace harassment. Remarkably, the feckless officers at the Department never prepared any written reports regarding Baron's complaints, even though one was supported by Lt. Pizzi. Indeed, the only time SID investigated was when Pizzi, an officer, filed a written report. This investigation seemingly had no teeth. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir.1996) (holding that the investigative process must be real).

The Department complains that it could not have done anything about the anonymous harassment. While the perpetrators (other than Hickey) were never identified, the jury could have concluded that the Department's insouciance amounted to condonation and resulted in his discharge. The harshness of the defendant's sanctions against Baron for minor policy infractions was also evidence of the Department's turning a cold shoulder to his plight and affirmatively joining in the peer pressure to force him out. Most significantly, the defendant threatened termination when Baron reported an assault on an inmate's girlfriend directly to the police rather than immediately to supervisors whom he later informed. Even though Baron was on probationary status, the jury could have found that the threatened sanction was draconian, under the circumstances, and forced him out.

To be sure, most of the testimony to support the verdict was uncorroborated testimony by Baron. However, in light of the evidence of a "code of silence" at the Department, and a custom of retaliating against those who break it, the jury could reasonably have inferred from the failure

of numerous defense witnesses (like corrections officers) to corroborate Baron's testimony that such a custom would make it extremely difficult to substantiate any allegations about it.[6] *Cf. Bordanaro*, 871 F.2d at 1157 n. 5 ("We are mindful of the difficulty plaintiffs encounter in proving the existence of such police department policies and customs. Plaintiffs are likely to encounter hostile witnesses and incomplete documentation of past abuses."). In sum, the jury could reasonably have drawn the inference that Baron's constructive discharge was caused by the unofficial custom in the Department of deliberate indifference to retaliatory peer-to-peer harassment against corrections officers who breach the "code of silence" by exercising their First Amendment right to speak about infractions by fellow officers.

## B. Statute of Limitations

Defendant raises for the first time in its post-trial brief an argument that Baron's § 1983 claim is time-barred by the statute's three-year limitations period. Defendant claims that because the jury specifically found that plaintiff did not prove that Hickey harassed him after January 4, 1998, there is no harassment evidence to support the § 1983 judgment within the limitations period. As it concedes, Defendant did not raise the statute of limitations claim in any of its pre-trial briefing, nor was it raised during trial or during the jury charge conference. The special verdict question asking only whether plaintiff proved that Hickey harassed him after January 4, 1998, was requested by Hickey's attorney. Defendant made no requests for instructions or special verdict questions that would bear on the statute of

---

**6.** One poignant example of the code of silence was Officer Holtzclaw who testified that Hickey didn't slam cheese on the table in front of Baron, but instead placed a handful of napkins on the table as a gesture of good will.

The jury could reasonably have inferred that this testimony was incredible (even Hickey conceded he bore no good will toward Baron), and was prompted by a desire not to testify against a fellow officer.

limitations issue. Therefore, I find that defendant waived the issue and cannot be heard to raise it at this late stage for the first time. In any event, plaintiff did claim that he was harassed on a daily basis by Hickey and others virtually from the time he reported Sgt. Curtis's misdeed to the time he resigned in August of 1998. The jury thus could have found that Baron's civil rights were violated on a continuing basis within the limitations period.

## C. Damages

■ Defendant contends that the $500,000 verdict was unsupported by the evidence and moves for a new trial on the damages issue, or, in the alternative, for a remittitur of the award. However,

> the assessment of damages cannot be disturbed unless the award exceeded "any rational appraisal or estimate of the damages that could be based on the evidence" or was "grossly excessive," "inordinate," "shocking to the conscious of the court," or "so high it would be a denial of justice to permit it to stand."

*Consolo v. George*, 58 F.3d 791, 795 (1st Cir.1995) (citations omitted). None of these conditions for disturbing the jury award is implicated here. While Baron hardly put in any evidence of economic damages at all, there was considerable testimony from him concerning the stress and anguish induced by the harassment. Indeed, the jury could have found that the stress was so great that in February it caused Baron to pass out at work, to suffer headaches, and eventually to quit a job he desperately needed for his wife's healthcare. In light of the length, extent, and viciousness of the harassment Baron suffered, the jury award was not unreasonable.

## D. Evidentiary Rulings

I find that Defendant's miscellaneous objections to evidentiary rulings are without merit.[7]

## E. Jury Instruction and Verdict Form

Defendant's post-trial objections to the jury instructions and verdict form were not presented at the charge conference and were not made on the record after the charge was read to the jury. In fact, at the charge conference, the Court complimented counsel for her proposed charge and used it essentially verbatim. The objections were therefore waived.

## F. Attorneys Fees

Plaintiff has moved for attorneys fees in the amount of $20,109.55. I find that $250 an hour for a civil rights trial in Boston is reasonable, and that the evidence concerning the claims against Hickey and the county substantially overlap. Defendant contends that Plaintiff has not produced contemporaneous time records. Plaintiff's counsel is required to produce those records within 14 days of receipt of the judgment. The parties shall consult to determine areas of dispute, if any. Any opposition to the contemporaneous records shall be produced within 14 days of receipt.

## V. ORDER

For the foregoing reasons, the defendant's Fed.R.Civ.P. 50(b) motion for judgment as a matter of law (Docket # 103), the motion for a new trial (Docket # 101), and the motion for a remittitur of damages

---

7. To the extent counsel believes I exhibited facial expressions at trial, she did not object in a contemporaneous or timely manner. Moreover, I gave a preliminary instruction and closing instruction to the jury to disregard any perceived facial expressions. I note that counsel did engage in inappropriate conduct for which I did admonish her at sidebar.

or a new trial on damages (Docket # 102), are *DENIED*.